**NATIONAL SURETY CO. v. FIRST STATE BANK OF TOMBALL et al. (two cases).[1] (Nos. 8232, 8233.)***

(Court of Civil Appeals of Texas. Galveston. June 20, 1922. Rehearing Denied Oct. 5, 1922.)

**1. Principal and surety ☞155 — Petition on fidelity bond held not subject to general demurrer.**

In an action on a bank employee's fidelity bond, conditioned that he and the surety should hold the bank harmless against loss from embezzlement, abstraction, or willful misapplication of money or securities, a petition alleging that employee caused the bank to sustain pecuniary loss of money or valuable securities, embezzled, wrongfully abstracted or misapplied by him in the course of his employment, stated a cause of action and was not subject to general demurrer because not stating the details of the breach.

**2. Principal and surety ☞79 — Condition of fidelity bonds held breached where principal assisted another to embezzle bank's funds; "willful misapplication."**

Where subordinate officers and employees of a bank not only had guilty knowledge of the vice president's abstractions, but aided and assisted therein by concealing what they knew, by false entries on the bank's books, by handling, using, hiding, and being parties to the removal of sheets from the ledger, by statements made to depositors and the commissioner of banking, and by remittances of the bank's funds to cover checks drawn by the vice president without money to meet them, they were guilty of a willful misapplication, if not of embezzlement or appropriation of the bank's property, within the condition of their fidelity bonds.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Willful Misapplication—Willfully Misapply.]

**3. Principal and surety ☞79—Remittances by bank cashier to cover embezzler's checks held "wrongful abstraction" within bond.**

A bank cashier's remittances of money to other banks by means of drafts to cover checks drawn by the vice president in pursuance of his practice of embezzling the funds of the bank amounted to a wrongful abstraction of the bank's money within the condition of the cashier's fidelity bond.

[1] The court wrote separate opinions in these two cases. The opinion in the Hirsch case is identical with the opinion here set out, except that in the Hirsch opinion the name "Robert W. Hirsch" appears throughout instead of the name "R. W. Leslie."

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error refused November 29, 1922.

**4. Principal and surety ⊜~79—That principal's misapplication of funds done at direction of superior officer no defense.**

It was no defense to actions on the fidelity bonds of a bank's cashier and assistant cashier that their misapplication of the funds of the bank were done at the direction and command of the vice president and superior officer, where they were laboring under no physical compulsion or mistake, but with intimate knowledge of the vice president's embezzlements, were prevailed upon to assist him by his statements that they were as guilty as he.

**5.· Principal and surety ⊜~79 — Recovery on embezzler's bond does not prevent recovery on bond of others assisting in misappropriation.**

That a bank, sustaining a loss of $59,000 through its vice president's embezzlements, recovered on his bond for $5,000, did not prevent recovery on the bonds of the cashier and assistant cashier, who aided him in misappropriating the bank's money.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Actions by the First State Bank of Tomball and another, one against the National Surety Company and R. W. Leslie, and the other against the National Surety Company and Robert W. Hirsch. Judgment for plaintiffs in each action, from which judgments defendant Surety Company appeals. Affirmed.

Ball, Merrill & Ball, of Houston, for appellant.

Kennerly, Lee & Hill, of Houston, for appellees.

GRAVES, J. "This is an action brought by the First State Bank of Tomball, hereinafter called the bank, and Ed. Hall, acting in his official capacity as Commissioner of Insurance and Banking of the State of Texas, against the National Surety Company and R. W. Leslie, for the purpose of recovering on a fidelity bond executed by defendants in favor of the bank, by the terms of which the said R. W. Leslie, as principal, and the National Surety Company, as surety, undertook to indemnify the bank against such pecuniary loss as it might sustain of money or other valuable securities embezzled, wrongly abstracted, or willfully misapplied by said R. W. Leslie as an officer or employee of said bank in the course of his employment as such.

"Plaintiffs pleaded that the Commissioner of Insurance and Banking was in lawful charge of the affairs of the bank; set up the execution of the bond in the sum of $5,000, and the continuation thereof until the date in November, 1920, when the said Commissioner took charge of the affairs of the bank; set out the terms of the bond, and alleged its breach in language following the wording of the bond, but without alleging in detail the facts constituting the breach, and sought to recover against both defendants the full amount of the bond.

"The defendants pleaded, in addition to their general and special exceptions and general denial, that if the bank suffered any pecuniary loss, as alleged, that the same was the result of the misconduct of Roy Mackey Huffington, who was the vice president of the bank and in control of the majority of the bank stock and the management of the bank, who was solely guilty of the acts complained of and the only beneficiary thereof, and that the said R. W. Leslie did not use, embezzle, misapply, or appropriate to his own use any part of the bank's property, nor did he directly or indirectly profit by the transactions of the said Huffington, or do any other act sufficient to authorize a recovery on the bond; and defendants further pleaded that the said vice president, Roy Mackey Huffington, was also under bond in the sum of $5,000 to the said bank at the time said loss occurred, and that he was directly responsible therefor, and that the defendant National Surety Company was surety on the bond of the said Roy Mackey Huffington, and upon demand being made therefor by plaintiffs, had paid to them on account of the defalcations of said Huffington, the full amount of the penalty of his said bond, and that, by reason thereof, plaintiffs were estopped and precluded from recovering on account of the same transactions on the bond sued on in this case.

"The case was tried to the court without a jury, and a judgment was rendered on the 16th day of May, 1921, in favor of the plaintiff against both defendants for the sum of $5,000, the full amount of said bond, together with the interest thereon."

The statement thus made has been taken from appellant's brief.

The Surety Company has appealed through writ of error.

Appellant, under four assignments of error, presents as many contentions for reversal in substance and order as follows:

1. Its general demurrer to the petition of plaintiffs below should have been sustained, because no facts constituting a breach of the bond sued on were set up, but merely an allegation, in the language of the bond itself, that its obligations were not complied with, which constituted only a conclusion of the pleader.

2. The judgment is so against the great weight and preponderance of the evidence as to be manifestly wrong, because the acts proven against Leslie did not come within the terms of the bond, in that:

"(a) They did not constitute embezzlement, because none of the funds or securities of the Bank were converted to the use of said principal.

"(b) They did ont constitute wrongful abstraction because none of the funds or securities of the bank were abstracted, or taken out of the bank by such principal.

⊜~For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

"(c) They did not constitute willful misapplication, because if any funds or securities of the bank were misapplied by said principal, the same was not willfully done, in that such acts were in each instance committed, not voluntarily, but by the direction and at the command of a superior officer of the bank who was in charge of its affairs."

3. "Since the only obligation of appellant as security on the fidelity bond sued on is to hold the bank harmless against, and to pay to it such pecuniary loss as it may sustain of money or other valuable securities embezzled, wrongfully abstracted, or willfully misapplied by the principal in the bond in the course of his employment, it is not liable on account of moneys embezzled, wrongfully abstracted, or willfully misapplied by a superior officer of the bank, in the absence of any evidence showing that the principal in the bond ever received any financial benefit from the acts of such superior officer, or participated in such acts in any other manner than to carry out the instructions of such superior officer."

4. "The bank having taken fidelity bonds from its active vice president, and from other officers and employees, including the principal in the bond sued on, and such vice president having been guilty of misappropriating the funds of the bank to his own use, thereby breaching the terms of the bond, and the bank then having claimed and collected from the surety on the bond of the vice president the full penalty thereof, it cannot thereafter collect from the surety on the bond of another of its officers or employees on account of such misappropriation of funds, merely because such officer or employee may have had a guilty knowledge of the acts of the vice president, or may have actually rendered assistance to said vice president in effecting such misappropriation."

The appellees, upon the other hand, insist that—

The record shows not only that Leslie "had knowledge of the manipulation of the books and the misappropriation of the funds of the bank by Roy W. Huffington, but that he aided and assisted Huffington by entries made by Leslie from time to time on the books of the bank, drafts, checks, etc., signed by him, and through funds paid out belonging to the bank, by removal, handling, and concealment of the sheets (marked M) removed from the bank's books, by statements made to the Commissioner of Banking, to the bank, and to the depositors by Leslie, all in aid of and contributing to the acts of Huffington."

The established facts deemed material to a determination of the issues thus joined upon appeal, in substance, were these:

The terms of the bond ran:

"Now, if the above bounden officer and surety shall hold the bank harmless against, and pay to it such pecuniary loss as it may sustain of money or other valuable securities embezzled, wrongly abstracted, or willfully misapplied by said officer in the course of his employment as such, and in the course of his employment in any other position in the bank to which he may be appointed, re-appointed, elected, re-elected or temporarily assigned, then this obligation is void; otherwise to be and remain in full force and effect."

The breach of this obligation was alleged in this form:

"Plaintiffs further represent that subsequent to the execution of said bond, on the 1st day of June, 1917, and prior to the 10th day of November, 1920, the defendant, R. W. Leslie, while holding the position of cashier of the First State Bank of Tomball, did cause said bank to sustain pecuniary loss of money or other valuable securities embezzled, wrongfully abstracted, or willfully misapplied by said officer in the course of his employment as such, and in the course of his employment in any other position in the bank to which he was appointed, re-appointed, elected, re-elected, or temporarily assigned during such period of time in a sum substantially greater than $5,000, and being, according to the information and belief of the plaintiffs, in the aggregate sum of $59,-295, approximately."

The appellee bank was mulcted in all for $96,000, $37,000 of which was made good through another bank, leaving $59,000 unaccounted for, all of which both Leslie and Hirsch testified Huffington got, there being no evidence that either of them got any of it; Huffington absconded about the time the bank failed, his whereabouts being still unknown at the time of this trial; he was vice president, Leslie was cashier, and Hirsch assistant cashier and brother-in-law of Huffington, each of whom made a $5,000 bond of the tenor of that sued on in this cause, with appellant as surety; on proof of the loss being made to it, the surety company paid for the appellee bank's benefit the full amount of the Huffington bond; most of this $59,000 that Huffington seems to have misappropriated was taken within a period of six months next preceding the closing of the bank on November 9, 1920, which was during the period of service of both Leslie and Hirsch; in the absence of Huffington, which covered much of the time, Leslie was in charge, his own statement on that point being:

"During the time that he was not present there was nobody there ever active but me; there was no other officer ever paid any attention to it. I was the senior active officer as cashier, during his absence. During all the time that I was there, the president of the bank was never an active officer; he would come in, just come in and make his deposits and go on; that is about all any of them ever did. He did not draw any salary as president, or actively conduct the bank."

The general effect of the plan used by Huffington and testified to in detail by Leslie and Hirsch was that, with their continuing knowledge, acquiescence, and assistance, he would take from the general ledger of the bank's books, which was kept by Leslie, it being the loose-leaf system, the sheets containing the true record of the deposits of

various customers, put these back in a hidden place in the vault, and substitute in their place other "doctored" sheets showing reductions to the extent that he desired to "hit" those particular accounts for, appropriating the difference to his own use; the sheets so removed, designated in this record as "M," were in evidence, and both Leslie and Hirsch used them constantly in aid of Huffington's manipulations; Leslie prepared, swore to, and signed the statements required from time' to time by the Commissioner of Banking, and also made by cashier's checks and otherwise remittances of his own bank's funds to meet checks cashed by Huffington at correspondent banks, while Hirsch, who kept the books showing the status of individual accounts with the bank, as a rule, made up the statements for depositors who wanted to have their accounts checked up; sometimes, however, in urgent cases, these too were prepared by Leslie. On these matters the two testified at length, only what are deemed sufficient extracts being given. Leslie said:

"With reference to how the balances of these depositors who had amounts shown to be due them on deposits were shown on the bank's statements: for instance, if Hμffington used $500 of $1,000 that John Jones had on deposit, he would just simply run one of his checks against that, don't you see? Suppose he had a check for $500, he would run his check against that account and that would just leave the account $500 less, don't you see, and that sheet stayed in the ledger binder, don't you see, and it did not affect the statements at all, my statements, whatever. It just showed that he had run his checks against that account just the same as if that man did not have but $500, don't you see? When the examiner would come there to examine the bank, he would not be shown these sheets identified with the mark 'M.' The books always balanced with those ledger sheets that were actually in the binders, don't you see? * * *

"I did not include in the deposits the amount of actual deposits that had been taken out by Mr. Huffington; if we had, we would have shown more deposits than we had, actually had; the statement would not balance. My books would balance; my books were absolutely in balance; I do not mean that my books would not balance. If we had included in that balance the amount of deposits shown on these ledger sheets marked 'M' which had been removed, then we would have had to have shown an overdraft for the same amount to offset it., * * *

"I kept the general ledger; that is it; I kept that. I did not show on the general ledger during the time that these manipulations were taking place the amounts on the sheets marked 'M' as being on deposit which Mr. Huffington had manipulated and misapplied; I could not; they were not there to be shown. * * *

"When those parties made those deposits, of course that went on the general ledger, and then when Roy ran a check through the bank that check was deducted from the general ledger, and that sheet taken out instead of showing—when the sheets were taken out, I made a corresponding deduction on my general ledger of the amount of checks run by him against these sheets. Those checks that he drew went into that general ledger; yes, sir. Every check that he drew went through that general ledger and every deposit that was made went through there absolutely. The reason I did not show his checks that were run through this general ledger as being overdrafts upon his part, rather than as going against these individual accounts, was, as I just told you, he would not let me; he would not permit it.. *. * *

"Sometimes we would have a letter for a week; sometimes nearly ten days we would have a letter in there, and I would not remit, and I was supposed to remit for those the day I received them, and the Houston bank would go to tracing us. When he would come out and tell me to remit, I was afraid not to remit to my correspondent. He would take those checks himself and check the checks off against the ledger. Sometimes he would register the drafts on the register. Most of the time, though, he made me do it. I always signed the drafts and remitted; I nearly always signed the drafts. I often refused to make remittances on collections like that, including items drawn by Huffington himself against his own account, and he would come in and want me to check up and remit it, and I positively refused to. I told him I just simply would not do it, and he would have to make it good. He would have to get the money there to cover it, and we would chew the rag, and he would say, 'Well, I will come back to-morrow; I will fix that up to-morrow,' and maybe it would go two or three days, and he would come back and scare the fool out of me, and I would have to remit it. The result was that I always finally remitted the full amount. I never was able to prevail in my refusal to remit; I was afraid to antagonize him too much."

Hirsch's version was:

"These sheets that are marked 'M' were taken out of the binder by Mr. Huffington. I did not personally at any time remove any of these sheets from the binder. When Mr. Huffington took them out, he gave them to me and told me to put them in the vault there. * * *

"In other words, I kept the new sheets as well as the old sheets posted from day to day. I kept the old sheets posted so that I could always know the true balance due the depositors. I kept the new sheets so that an examiner could not tell that account had been tampered with. Well, if anybody came in and wanted his book balanced, his account balanced, I had to balance them according to those, the sheets that had been removed. When the examiner came to examine the bank, he never did see those sheets marked 'M'; I never did show him those. I would show him those kept in my book. Those sheets marked 'M' were correctly kept by me. The new sheets were correctly kept by me, that were contained in the binder. * * *

"Supposing a check would come in for a $1,000 drawn by Mr. Huffington, and he would come out there and take out two ledger sheets to cover that amount, if there had been no other deposits, at the end of the day I would not show $2,000 net on deposit; those $2,000

would have been posted to Huffington's account and then checks drawn against it, would have been just like if I would have taken those checks and run them against somebody else's account. That would make the amount on deposits $2,000 net that day, assuming that there were no other transactions had in the bank on that day. Every day that he drew checks against his account or somebody else's account, I had to decrease the deposits to the extent that those checks were drawn. When the bank was closed, the amount of the deposits had been cut down so much from time to time that we actually showed the deposits to be about somewhere between $58,000 and $59,000 less than what they really were. That is the situation as it existed. * * *

"It is a fact that I kept those ledger sheets in that binder in the manner which I kept them in order that it might not be disclosed that Mr. Huffington had gotten this $60,000 and some odd, in order that this would not be known to an examiner or any person that came."

On the night the situation was first made known to the bank examiners, Leslie said to Hirsch in reference to these "M" sheets which had been so kept hidden in the vault: "Just might as well show them now; the cat is out of the bag."

On such a record we are unable to sustain any of appellant's objections.

[1] The petition of the appellees stated a good cause of action and was not subject to general demurrer.

[2] Neither, we think, can it be held that the terms of their bonds were not in legal contemplation breached by both the cashier and the assistant cashier, despite the fact that neither was shown to have himself profited by the vice president's misapplication of the bank's funds. The record does show, indeed in the quotations given from their own testimony, that both of these subordinate officers and employees of the bank not only had guilty knowledge of Huffington's abstractions all the while they were going on, but —unfortunate for them as it may now turn out to be—aided and assisted therein by concealment of what they knew, by entries individually made, from time to time, on the bank's books, by handling, using, hiding, and being parties to the removal of the "M" sheets from the ledgers, by statements made to the depositors by Hirsch and to the Commissioner of Banking by Leslie, as well as by remittances of the bank's funds by the latter to cover checks of Huffington which were known to have no money behind them.

These confessed acts, while they may not amount to embezzlement, which means an appropriation of the property taken to the use of the taker, do at least constitute a willful misapplication, which may be either for the benefit of the taker or some other person. Ferguson v. State, 80 Tex. Cr. R. 383, 189 S. W. 273; United States v. Britton, 107 U. S. 655, 2 Sup. Ct. 512, 27 L. Ed. 520. See, also, article 574, R. S. of Texas, 1911; article 523, Texas Penal Code; section 5209 U. S. Revised Statutes (U. S. Comp. St. § 9772).

[3] Indeed, as concerns the cashier, we are unable to hold that there was not also a wrongful abstraction of the bank's money when he, in the circumstances above detailed by himself, signed the drafts and made the remittances to other banks to cover checks issued by Huffington in pursuance of his known practice of niching from his own bank; this was an actual taking of funds out of the bank, as much so as if he had personally removed and delivered them, and the fact that it was done for another's financial benefit rather than his own would not make it any the less a wrongful abstraction on his part.

[4] The argument that the misapplication we have found to have been participated in by both the subordinate officers was not willful within the meaning of the bond, because done at the direction and command of their superior officers in charge of the bank's affairs, is not thought to be sound. Under their own statements they were neither laboring under physical compulsion nor mistake of any sort, but, having at all times intimate knowledge of Huffington's misdeeds, were simply influenced by and prevailed upon to continue their assistance to him in committing them by the reminder that they were as deep in the mud as he was in the mire because they had not at first opportunity refused. They excused themselves for not having done that on the ground that Huffington, when the first infractions were called by them to his attention, promised to immediately straighten them out. In circumstances such as these, men, being free moral agents, may not supinely submit to the mere intellectual persuasions of others and then claim to be absolved from all individual responsibility; might as well say that, if, instead of assisting him as they did by manipulating the books and doing the other acts they admitted, these young men had, under Huffington's instructions, taken the entire cash from the vaults and delivered it to him to be absconded with, it would not have amounted to an abstraction or willful misappropriation, because done at his direction; the mere suggestion offends.

[5] The concluding proposition of appellant that, because a $5,000 recovery was had on Huffington's bond, there can be no further one on the separate and distinct obligation here involved, is likewise untenable. It proceeds upon the mistaken assumption that all the $59,000 loss was exclusively the result of Huffington's acts alone; such is not the case; it must, under the facts, be regarded as occasioned by Leslie and Hirsch as well, by reason of the aid, comfort, and assistance they rendered their superior; if, as we have before concluded, there was misappropriation on their part, so long as the amount paid by appellant on Huffington's bond did not equal

the entire loss sustained by the bank, that payment would be no defense against this suit.

All assignments have been overruled, and the trial court's judgment affirmed.

Affirmed.