AUSTIN, Commissioner of Banking, v. NIEMAN et al. (No. 600.)

Court of Civil Appeals of Texas. Waco. Dec. 1, 1927.

Rehearing Denied Jan. 5, 1928.

1. Appeal and. error ⊜⇒846(6)—In absence of findings and conclusions, judgment of court sitting without jury must be- affirmed if evidence supports it on any theory.

Where case is tried before court without jury and court does not file findings of fact and conclusions of law, judgment must be affirmed if there is evidence to support it on any theory of case.

2. Insurance ⊜⇒430—Bank employee need not derive personal profit from breach of duty to render surety on fidelity bond liable; "wrongful abstraction"; "willful misapplication."

Under fidelity bond to save bank harmless against pecuniary loss by wrongful abstraction or willful misapplication of funds by employee, it is not necessary that employee derive personal profit from breach of duty, "wrongful abstraction" being unauthorized, illegal taking of funds or securities from control of bank and appropriation thereof to benefit of taker or of another with his consent, and "willful misapplication" being willful, unauthorized, illegal application of bank's funds or securities to use of employee or of another with his knowledge and consent.

[Ed. Note.—For other definitions, see Words and Phrases, First- and Second Series, Willful Misapplication—Willfully Misapply.]

3. Appeal and error ⊜⇒1010(1)—Findings of court sitting without jury are entitled to same consideration as jury's verdict and will not be reversed where sustained by some evidence.

Where case is tried to court without jury, court's findings on fact issues are entitled to same consideration as jury's verdict, and will not be reversed by appellate court where there is some evidence to support them, even though appellate court might have reached different conclusion from evidence.

4. Insurance . ⊜⇒665(4)—Evidence supported finding that bank employee was not guilty of wrongful abstraction or willful misapplication of bank's funds, within fidelity. bond.

In action against bank employee and surety on fidelity bond for funds alleged to have been wrongfully abstracted or willfully misapplied by employee, evidence *held* sufficient to support finding that employee was not guilty of wrongful abstraction or willful misapplication by aiding cashier in misappropriation of bank's moneys though he acted as bookkeeper during time cashier made such misappropriations, and hence recovery on bond was properly denied.

Appeal from District Court, Hill County; Walter L. Wray, Judge.

Action by Chas. O. Austin, Commissioner of Banking, against Robert A. Nieman and another. Judgment for defendants, and plaintiff appeals. Affirmed.

Frazier & Averitte, of Hillsboro, and Spencer & Rogers, of San Antonio, for appellant.

Jos. W. Hale, of Waco, and J. E. Clarke, of Hillsboro, for appellees.  .

STANFORD, J. This suit was filed by the commissioner of banking on December 22, 1923, against Robert A. Nieman as principal, and the Maryland Casualty Company as surety, on a fidelity bond for $2,000, conditioned that the First State Bank of Malone should be held harmless against such pecuniary loss as it might sustain of money or other valuable securities embezzled, wrongfully abstracted, or. willfully misapplied by Robert A. Nieman. Appellant alleged that the condition in said bond had been breached, and that said bank had sustained a loss of more than $2,000 on account of the embezzlement, wrongful abstraction, and willful misapplication of its funds by Robert A. Nieman. Appellees answered by general denial, and appellee Maryland Casualty Company further pleaded an accord and satisfaction by reason of its payment of $5,000 to the commissioner of insurance on a similar fidelity bond for S. E. Lowe, cashier of said bank, and on

---

account of the same transactions complained of in appellant's petition.

On the first trial the court instructed a verdict for defendant, appellees herein, and judgment was rendered accordingly, from which judgment and action of the trial court appeal was taken by appellant herein to this court, where said judgment was reversed and the cause remanded for further trial. Chapman, Commissioner of Banking, et al. v. Nieman et al., 276 S. W. 302. An examination of the opinion in this case will aid in understanding the nature of the case.

The last trial was before the court without a jury, and the court rendered judgment for appellees, from which judgment appellant has duly appealed and presents the record here for review. No findings of fact and conclusions of law were filed by the trial court.

[1] Under 16 assignments of error, and 14 propositions submitted thereunder, appellant contends, in effect, that the trial court erred in rendering judgment for appellees because such judgment is contrary to the uncontradicted evidence, or is against the great weight and preponderance of the evidence. It will thus be seen the only issue involved in this appeal is whether under the evidence the court was authorized to render judgment for appellees. This case having been tried before the court without a jury, and the court not having filed findings of fact and conclusions of law, the judgment must be affirmed if there is evidence to support it upon any theory of the case. Guerra v. Rodriguez et al. (Tex. Civ. App.) 120 S. W. 593; Daniel v. De Ortiz et al. (Tex. Civ. App.) 140 S. W. 486, and cases cited; Broussard v. Cruse (Tex. Civ. App.) 154 S. W. 347.

[2] It will be observed the obligation assumed by appellees under the bond sued upon was to indemnify the bank for any pecuniary loss suffered by reason of embezzlement, wrongful abstraction, or willful misapplication of its funds or securities by Robert A. Nieman. There is no contention that Nieman embezzled or aided or assisted any one else in embezzling any of the funds or anything of value belonging to said bank. Wrongful abstraction, as used in said bond, means an unauthorized and illegal taking or withdrawing of funds or securities from the possession and control of the bank and the appropriation of the same to the benefit of the taker, or to the benefit of another, with his consent. Willful misapplication, as so used, means a willful, unauthorized, and illegal application of the funds or securities of the bank to the use and benefit of the person making such application, or to the use and benefit of another with his knowledge and consent. Maryland Casualty Co. v. Farmers' State Bank & Trust Co. (Tex. Civ. App.) 258 S. W. 584; Chapman, etc., v. Nieman (Tex. Civ. App.) 276 S. W. 302. In such cases it is

not necessary that the employee shall have derived any personal profit or advantage from his breach of duty. It is sufficient if his actions have intentionally resulted in the abstraction or misapplication of the funds or securities of the bank or affirmatively contributed thereto and another with his knowledge and consent has profited thereby. National Surety Co. v. First State Bank (Tex. Civ. App.) 244 S. W. 217; Chapman, etc., v. Nieman (Tex. Civ. App.) 276 S. W. 302.

[3] The evidence is undisputed that S. E. Lowe, the cashier and managing officer of said bank, from time to time abstracted, misapplied, and appropriated to his own use a large sum of money belonging to said bank. There is no contention that Nieman, who was the bookkeeper for said bank, did anything wrong for the purpose of reaping a benefit to himself; but appellant contends, in effect, that appellee Nieman, with knowledge of Lowe's unlawful purpose to abstract, misapply, and appropriate the money of the bank to his own use, affirmatively and intentionally aided and assisted Lowe in so doing in such manner as to contribute to his success. Whether or not Nieman, with knowledge of Lowe's unlawful purpose to abstract, misapply, and appropriate the money of the bank to his own use, affirmatively and intentionally aided and assisted Lowe in so doing in such manner as to materially contribute to Lowe's success, is a question of fact, if there is any conflict in the evidence, or if the evidence is such that different deductions may be drawn therefrom. The trial court treated this as a question of fact, and resolved said issue in favor of appellees. Where a case is tried before the court without a jury, the court's findings on issues of fact are entitled to the same consideration as the verdict of a jury, and it is well settled that such findings will not be reversed by the appellate court where there is some evidence to support them, even though the appellate court might have reached a different conclusion from the evidence. Crawford v. Beaver, etc., Co. (Tex. Civ. App.) 273 S. W. 892, and cases cited; Burnett v. Boyer et ux. (Tex. Civ. App.) 285 S. W. 670.

[4] Is there any evidence that Nieman did not, with knowledge of Lowe's unlawful purpose to defraud the bank, affirmatively and intentionally aid Lowe in so doing? There is no direct testimony in the record that Nieman did, with such knowledge, so aid Lowe, and all of the testimony, if any, tending to show Nieman did so aid Lowe, was circumstantial in its nature. The record discloses that the set of books kept in the bank consisted of a cash book, individual ledger, general ledger, statement ledger, bills receivable, bill of exchange, and reconcilement book; that the individual ledger and the statement ledger each was a loose-leaf ledger and all entries in said two loose-leaf ledgers

were made with a posting machine, and any page or leaf in either the individual ledger or the statement ledger could be removed therefrom by simply lifting the same out of such ledger; that all the errors and manipulations in connection with this complete set of books were in the individual ledger and the statement ledger. There were no changes, erasures, or false or fraudulent entries in any of the other books. The system employed by S. E. Lowe, the cashier and sole manager of the bank, in filching the bank's money, it seems, consisted of a clever manipulation of the individual ledger and statement ledger in connection with what was referred to throughout the trial as a "dummy ledger." All entries in the so-called dummy ledger were also made with a posting machine. It was therefore impossible to prove who made any of the given entries in the dummy ledger, the individual ledger, or the statement ledger. The entries in all of the other books of the set were in pen and ink. The general ledger was the key book; it was supposed to reflect the total of the other books. It is what you might call the hub, and the others the spokes. The dummy ledger had its direct relation to the individual ledger and the statement ledger, both of which, as well as the dummy ledger, were kept with a posting machine. The dummy ledger was kept in the vault of the bank. Nieman testified that he did not know of the existence of this dummy ledger until after the bank was closed, when it was found in the vault, and in this statement he is not contradicted. Mr. Edmond, who took charge of the bank on its being closed, testified:

"If S. E. Lowe had lifted out of the individual ledger out in the bank, a customer's ledger sheet that showed that he had $500 in the bank, and put that sheet in the dummy ledger in the vault, and gone to some other account on that ledger and credited that with $500, the books of the bank would still balance. There wouldn't have been any shortage shown by that transaction. If a week later he would debit that particular account with $500, that would then show the true condition of that customer's account. If at the same time he was to credit cash for $500 and put the money in his pocket, the books would still balance. The customer's individual ledger sheet out in the ledger would be correct, and the books would still be in balance, and Mr. Lowe would have $500 of the bank's money."

This witness testified further:

"I never found one note or one check in the files of the bank which to this good hour I have ever heard any one charge was forged by Robert Nieman."

H. N. Pardro, the liquidating agent of the banking department, after testifying that he took charge of the books of the bank and turned them over to Mr. Mings, a special agent of the banking department, and had none present, except the general ledger, testified:

"This is the general ledger. * * * This is one of the books that Robert kept a part of the time. I think I know his handwriting. I don't remember that I found in the ledger, where there are thousands and thousands of entries, one erroneous entry made by Robert A. Nieman. * * * All of those loose-leaf books, the individual ledger and the statement book, were worked on exclusively or entirely by a typewriter or posting machine; there was not any entry there in handwriting. All the other books were substantially kept in handwriting. If any one wanted to change the books pertaining to the individual ledger or the statement ledger, they could go into that book at any time and change that sheet and put it back, and you never would know what had happened. They could not do that with the general ledger; they would have to erase, scratch out, or write over. * * * The dummy ledger was sheets just like the individual ledger sheets as to size. In fact, you could take sheets out of the dummy ledger and put in the individual ledger and never know the difference until you went to prove up. It was in the dummy ledger in the vault that the wholesale fraud was found."

The record further shows that S. E. Lowe, as cashier of the bank, had full control and management of the bank; that Nieman, the bookkeeper, only a boy, was under him and subject to his control; that Lowe dictated the manner and method of keeping the books; that Lowe was frequently seen at the bank after supper at night, apparently at work; that Nieman made up the statements of depositors from the individual depositors ledger, but that Mr. Lowe required such statements to be submitted to him before being sent out; that occasionally a customer would complain to Nieman that he had more money in the bank than his statement showed, whereupon Nieman would refer to the individual ledger and show him it was correct as shown by said ledger. Appellant contends it was impossible for Nieman to have been connected with the bank at the same time Lowe was robbing it and not know of the latter's unlawful purpose. But the record shows several of the state's most capable bank examiners were unable to discover Lowe's fraudulent manipulations until the dummy ledger was found. It was the key that unlocked Lowe's secret, and both Nieman and Tate, another employee of the bank who assisted Nieman at times in keeping the books, testified that they knew nothing about the dummy ledger until after the bank was closed. We think the testimony of W. L. Edmond and others, set out above, explains how Lowe took the bank's money and at the same time kept the set of books in balance, and no one could have discovered his manipulations without having access to said dummy ledger. The record discloses further that when the bank was closed for some time Nieman worked with the representatives of the

banking department, and that he fully and freely furnished such representatives all the information he had and assisted them in every way he could in getting at the true condition of the bank. The record shows further that after the bank was closed the grand jury made a thorough examination. In this investigation the banking department was represented. The Attorney General's department had a representative to assist the state. The grand jury had all the books and files of the bank before it.

Nieman appeared before said grand jury and was questioned for several days, but no indictment was found against him. A great number of witnesses testified, in effect, that they had known Robert Nieman all his life and that his reputation for truth and veracity and for honesty and fair dealing was good, and also that he was a young man of frugal habits, careful with his money, and not given to extravagance. But appellant contends that S. E. Lowe, some time before the failure of the bank, was short in his account with the bank and Nieman knew of it, and that Lowe forged the names of customers to notes and checks and passed them through the bank, and Nieman necessarily knew of this. Nieman testified in substance, and all the evidence so shows, that S. E. Lowe was held in great esteem and confidence by the people of that community; that Lowe had the general control and management of the bank and all its employees; that in November, 1922, the general ledger showed the cash resources of the bank were a little over $7,000, and the individual deposits on that date were $93,928.41, and that he (Nieman) told Mr. Lowe on said date about the cash revenue being short, and he (Lowe) said he knew it, and he further said either that he had fixed it or would fix it; that Mr. Rex Reeves was at said time an officer of the bank and was present; and that he (Nieman) told Mr. Reeves about the shortage and talked to Reeves and Lowe about quitting, and Mr. Reeves told him (Nieman) that it was all right, to continue his services; and that he (Nieman) believed what Lowe and Reeves told him and that they were honest men, and that the affairs of the bank were being conducted in a proper and businesslike way.

The record shows further that Willie Tate was an employee of the bank, and sometimes when Nieman was out Tate kept the books. Both Tate and Nieman testified, in substance, that they did not find out until after the bank was closed that S. E. Lowe had been forging notes and checks in the bank. They knew Lowe frequently signed the names of customers to notes and checks and passed them through the bank, but did not know they were forgeries; that they thought Lowe had the authority to do it. Frequently a customer

who had a note due would phone into Lowe to sign his name to a check in payment, or to another note in renewal. No customer ever made any complaint, to their knowledge, of his name being signed to a check or note. The above evidence as to the alleged shortage in November, 1922, and to Lowe's signing the names of others to notes and checks, is not only uncontradicted, but is corroborated by other evidence. In all of the books and various records pertaining to the business of the bank covering a number of years, in which thousands and thousands of entries were made by Nieman, there is no evidence that a one of them was fraudulent or erroneous. There is no direct evidence, either oral or documentary, that Nieman ever at any time knowingly or intentionally did or failed to do anything for the purpose of aiding Lowe in filching the bank's money, or for the purpose of aiding him to cover up such peculation.

We have not attempted to set out all the evidence tending to support the judgment of the trial court, but think the above is sufficient. Neither have we passed upon the other two grounds, want of notice to the bonding company and accord and satisfaction, on which the judgment is sought to be sustained. We do not think it necessary to consider these. On the former appeal of this case, this court held that as to whether or not Nieman, with knowledge of Lowe's unlawful purpose to abstract and misapply the funds of the bank, knowingly and intentionally aided him in so doing, was a question of fact for the court or jury. The evidence seems to be the same as on the former trial. We have again examined the evidence and find no reason to change our former holding. As we view the case, the judgment of the trial court is amply supported by the evidence, and ought to be and is hereby in all things affirmed.