[Civ. No. 2886.  Second Appellate District, Division Two.—June 7, 1919.]

## LOS ANGELES ATHLETIC CLUB (a Corporation), Respondent, v. UNITED STATES FIDELITY & GUARANTY COMPANY (a Corporation), Appellant.

[1] Fidelity Insurance—Notice of Acts Constituting Basis of Claim—Failure to Comply With Policy.—A condition in a policy of fidelity insurance "that the employer shall give notice by registered letter addressed to the president of the surety company at its office in Baltimore, Maryland, promptly after becoming aware of any act which may be made the basis of a claim," is not complied with where there is an entire failure to give the required notice to the president of the company, and a delay of about sixty days from the time the employer became aware of the employee's alleged defalcations, and of from ninety days upward from the time when they should have been, and probably were, sufficiently aware of these facts, before the matter was called to the attention of even the local agents of the insurance company.

[2] Id.—Materiality of Notice Provision—Strict Compliance.—A condition in a policy of fidelity insurance requiring the giving of notice promptly of any act which may be made the basis of a claim is a material provision of the policy, and must be strictly complied with in order to enable the employer to recover.

[3] Id.—Amount of Misappropriations—Method of Estimating.—In an action based on a policy of fidelity insurance, the court may arrive at an estimate of the amount of the employee's total misappropriations by the method of approximation from the daily average of articles consumed.

[4] Id.—Nonpayment for Articles—Burden of Proof.—In such an action against the fidelity insurance company to recover on a bond given to protect the employer against any loss that might be sustained by reason of the fraud or dishonesty of the employee, the burden is upon the employer to prove that the articles taken or consumed by the employee were not paid for.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles Wellborn, Judge. Reversed.

The facts are stated in the opinion of the court.

J. W. McKinley for Appellant.

Clyde E. Cate, H. W. Creighton, and Sol. A. Rehart for Respondent.

SLOANE, J.—This action was brought to recover on a bond or policy of fidelity insurance. The plaintiff employed one Walter L. Patterson as manager of its clubhouse at a salary of three hundred dollars per month, with the express agreement "that he was to receive no other remuneration, perquisites, or consideration," and "that he should pay the customary price or charge so fixed by plaintiff for every article of said goods, wares, and merchandise said Patterson should receive for himself and use to his own benefit"; and further, "that he was not, under any circumstances, to take, use, or receive for his own benefit any articles of goods, wares, or merchandise kept in stock by plaintiff as aforesaid without paying therefor the full price fixed by plaintiff as the selling price thereof to the members of its said club."

The defendant, a fidelity insurance company, for consideration, insured plaintiff against any pecuniary loss that might be sustained by reason of the fraud or dishonesty of said Walter L. Patterson up to and including the amount of five thousand dollars.

It stands admitted by the pleadings that Patterson was in the employment of the plaintiff, under the agreement as stated, from the first day of November, 1911, until the second day of May, 1914.

The trial court finds "that subsequent to the first day of July, 1912, the said Walter L. Patterson fraudulently and dishonestly, and contrary to and in violation of the terms of said agreement of employment, and without plain-

tiff's knowledge or consent, used, took, carried away, and converted to his own use goods, wares, and merchandise consisting of certain articles and commodities kept in stock by plaintiff for the use of its members, such as alcoholic and other beverages, cigars, candies, etc., of the reasonable value of $2,015.08.   That said Walter L. Patterson has not paid the plaintiff for any of said goods, wares, and merchandise, although demand was made on him therefor.'' The court further finds that plaintiff had no knowledge of the taking and appropriation of these commodities by Patterson until ''on or about the first day of April, 1914, and that thereafter, about said date, plaintiff advised the defendant corporation of the alleged acts of fraud and dishonesty on the part of Patterson.''

Defendant appeals from the judgment against it for $2,015.08, and costs.   It is urged that the judgment should be reversed for the following reasons:

1. Because plaintiff did not comply with the conditions of the insurance contract which required ''that the employer shall give notice by registered letter addressed to the president of the surety company at its office in Baltimore, Maryland, promptly after becoming aware of any act which may be made the basis of a claim''; and also that ''the employer shall, within ninety days after date of said notice, file with the surety company its itemized claim thereunder, duly sworn to.''

2. That the acts of Patterson on which the claim rests did not constitute fraud or dishonesty in the course of his employment, and were not such acts of dishonesty as were covered by the policy of insurance.

3. Insufficiency of the evidence as to the amount and value of the goods taken by Patterson.

4. Insufficiency of the evidence to sustain the finding that the articles taken and used were not paid for.

On the second specification of the first ground of objection to the judgment, we are of the opinion that the requirement for an itemized statement of the claim was as fully and satisfactorily made as it could be under the circumstances, by the affidavit of various officers and employees of the club, which appear in the record, and which give in detail all the information as to the nature and amount of Patterson's alleged misappropriations which the various witnesses pos-

sessed. These affidavits were in reasonable time, before bringing suit, furnished to representatives of the defendant company.

But as to the first specification, there does not appear at any time to have been a compliance with the express condition of the policy that notice should be given in writing to the president of the company; and it is more than doubtful if such notice as was conveyed to the local agents of the defendant was given with any degree of promptness after the officers of the plaintiff "became aware" of the acts of alleged dishonesty on which they base their claim.

It is claimed by plaintiff, and the trial court so found, that plaintiff had no knowledge of the alleged acts of dishonesty on the part of Patterson until on or about the first day of April, 1914. The only finding as to notice to the defendant is, that "thereafter and on or about said date, plaintiff advised the defendant corporation of the acts of fraud and dishonesty on the part of Patterson." This is perilously close to a vague and indefinite conclusion of law as to the matter of notice. Moreover, we are not at all satisfied that the evidence supports the finding as to the time of discovery of the facts, or of the alleged notice.

In the first place, there seems to have been a conspicuous lack of diligence on the part of the officers of the club in discovering Patterson's habits in the matter of personal consumption of the supplies of the club. It seems to have been a matter of common notoriety among the employees of the club, including the bartenders who served him, that he was a constant and capacious patron of the bar for years. From his subsequent investigations the vice-president of the club estimates that the aggregate of the goods and wares received by Patterson—most of which seems to have been openly procured by him from other employees at the bar—amounted in value to about six thousand dollars. Roberts, the head barkeeper, who was in that position throughout Patterson's employment as manager, testified that the latter received at his bar, on an average per day, four long whisky highballs, two cocktails, three to five pints of beer, two gin fizzes, and two glasses of Lithia water; and that he smoked about eight cigars per day, and received from two to six quarts of whisky per week, and six pints of champagne per week—together with cigarettes, light

wines, and other commodities not enumerated. The witness further states that he does not include in his list any liquor which Patterson might have drunk between 2:30 P. M. and 4:30 P. M., while the witness was off duty. Another bartender, named Sakai, testified that he was a bartender of the club after July 14, 1913, and that he served Patterson drinks on an average of about four pints of Budweiser a day, a cocktail before dinner, another about 6:30 P. M., and about three pints of whisky a week. Also occasional highballs and packages of candy. Shubata, another bartender, testifies to serving Patterson mostly highballs, Budweiser beer, and some champagne. He served him an average daily of from three to five highballs, about four pints of Budweiser, about three pints of whisky per week, a gin fizz in the morning, and sometimes wine, cocktails, and champagne.

All of this was done openly and from the service bar of the club. The witnesses further stated that Patterson paid very little, and that no account was kept by them.

One F. W. Lloyd, whose affidavit was admitted in evidence as part of the statement submitted to the defendant company, testifies that he was the house detective of the plaintiff club; about March 1, 1914, it was reported to him "by numerous employees of the club that Patterson was in the habit of drinking quite heavily, and that he was frequently intoxicated, and that the said employees believed that said Patterson was not paying for the liquor which he drank and had sent out to his house from the club; that this affiant reported said rumors to Mr. Frank A. Garbutt, vice-president of said club," and that Garbutt stated that he did not believe the rumors, but directed the witness to investigate. That on the expiration of a week, and "being convinced that said Patterson was defrauding the club of many dollars' worth of liquor each day," the witness again reported to Garbutt the result of his investigations. This affiant further avers "that it was generally known among the employees of said club that said Patterson was mulcting said club out of large quantities of valuable commodities daily, but that this knowledge on the part of said employees was just on hearsay and upon their observations of Patterson's apparent intoxication." According to this witness, the information contained in his affidavit was conveyed to

Mr. Garbutt, the vice-president and a director of the club, early in March, 1914.

The testimony of Mr. Garbutt himself is rather confusing. He states in one of his affidavits that in his capacity as vice-president of the club, he did, "on or about the twenty-fifth day of January, 1914, become cognizant of said acts of fraud and dishonesty on the part of said Walter L. Patterson, whereby said Patterson was misappropriating goods belonging to said Los Angeles Athletic Club." In another place, in answer to the question: "Did Patterson ever do anything which you considered as a violation of the terms of his employment?" he answered: "On or about three months before Mr. Patterson was discharged it was brought to my attention that he was drinking at the club." Patterson was discharged May 2, 1914. At another place in his affidavit he states that "during the period between January 28, 1914, and May 2, 1914, Patterson misappropriated goods of the value of $209.70," and "that the fraud and dishonesty of said Walter L. Patterson was not discovered or suspected by said Frank A. Garbutt, or any other officer of the Los Angeles Athletic Club, before or until the date last mentioned." If this refers to the date of May 2d, the date when Patterson was discharged, it is inconsistent with all the other testimony on this point. It is more probable that he refers to the "period" somewhere between January 28th and May 2d. At another place in his affidavits Mr. Garbutt states that on or about the 1st of April, 1914, facts were reported to him tending to show that Patterson "was systematically defrauding the club." It is upon this date that the court fixes its finding; but it may be observed that the witness does not state in this connection that he had no information of an earlier date. We find in the record a letter, introduced by plaintiff, addressed to Mr. Garbutt, signed by one J. E. Murphy, of date March 3, 1914, purporting to confirm a previous interview with Garbutt, which letter calls attention to a liberal supply of liquors at Mr. Patterson's home, and a statement by Patterson that 'Mr. Garbutt might be a shrewd business man, but he sure was easy when it came to club business, for he—Patterson—pulled it all over them when it came to taking an inventory in the wine-room." The letter also contains a statement of the writer that on leav-

ing the club on one occasion he saw the storeroom man come up from the wine-room and give Patterson three large boxes of cigars. There are also further statements in the letter calculated to reflect upon Mr. Patterson's integrity in his relations to the club.

The conclusion cannot be avoided that the officers of the club had information as early as the first part of March, 1914, sufficient to demand an investigation, and that every facility was close at hand and accessible for getting promptly at the facts. There seems to have been no hesitancy on the part of the various employees in telling what they knew, when asked.

In spite of this remarkable history of events, there is no pretense of any notice to the president of the defendant company, as required by the policy, and no evidence of any notice at all, so far as we have been able to discover, earlier than the last of May or the 1st of June, 1914. The only definite evidence on this point is contained in the testimony of Mr. Creighton, an attorney for the plaintiff, who states that he first became aware of the matters involving Patterson about April 1, 1914, when Mr. Garbutt called him into his office and told him that he had information tending to show that Mr. Patterson had been violating his contract. He says he took the matter up with Mr. Shroder, of the Frank M. Kelsey Company (local agents of the defendant, we assume), some time during the month of May. Further on in his testimony he says: "The first occasion of taking these facts up with Mr. Shroder, or anybody, was the latter part of May or the first of June." Later on in his testimony, having examined certain correspondence of date May 7, 1914, he says that the claim was not presented to the Frank M. Kelsey Company "until *after* May 7, 1914." He states further that Mr. Shroder told him to place the claim in form and present it to him, and that he might wait until he had done so before sending formal notice to the president of the company. If any authority on the part of a representative of the local agent to make such a waiver of notice could be assumed under any circumstances, we are met by the provision of the insurance bond or policy that "none of its conditions shall be deemed to have been waived by or on behalf of said surety unless the waiver be clearly expressed in writ-

ing, over the signature of its president or secretary, or their duly authorized officer, and its seal thereto affixed."

[1] We have here, then, an entire failure to give the required notice to the president of the company, and a delay of about sixty days from the time the court found the plaintiff became aware of Patterson's alleged defalcations, and of from ninety days upward from the time when they should have been, and probably were, sufficiently aware of these facts, before the matter was called to the attention of even the local agents of defendant. And the authority, by the way, of these agents to act for the company in any capacity does not appear in the record.

[2] Respondent contends that this condition of the policy requiring prompt notice of the acts constituting the basis of a claim is not material to the rights of defendant, and that under the Civil Code, section 2611, the violation of an immaterial provision of a policy does not avoid it, unless it is so expressly declared in the policy. The contention that this express condition for prompt notice is not material to the contract is not sustained by respondent's authorities, and is contrary to the generally recognized construction of such requirements in insurance policies. Respondent's citations to the effect that notice is not material unless it is shown that injury has resulted from the failure to give same, in nearly every instance, deal with the implied requirements of notice under the general law of guaranty and suretyship. Here the parties expressly stipulated in their written contract for prompt and specific notice. To quote from another opinion: "The conditions in policies requiring notice of losses to be given, and proofs of the amounts to be furnished the insurer within certain prescribed periods, must be strictly complied with to enable the insured to recover. And it is not perceived that the conditions under consideration stand upon any different footing. The contract of insurance is a voluntary one, and the insurers have the right to designate the terms upon which they will be responsible." (*Riddlesbarger* v. *Hartford Ins. Co.*, 7 Wall. 386, 390, [19 L. Ed. 257, see, also, Rose's U. S. Notes], cited in *California Sav. Bank* v. *American Surety Co.*, 87 Fed. 118.)

Construing and applying a requirement of notice similar to the one here, in a fidelity insurance policy, in the case

of *California Sav. Bank* v. *American Surety Co., supra,* Judge Wellborn, of the United States district court, in his opinion, says: ''In case of loss upon an insurance against fire, an insurer is exonerated if notice thereof be not given him by some person insured or entitled to the benefit of the insurance without unnecessary delay. (Civ. Code, sec. 2633.) . . . Whether or not in other kinds of insurance notice is essential, depends upon the contracts which the parties make. The foregoing section, however, does emphasize in the strongest possible manner the materiality of notice in the case of fire insurance; and it is believed that in fidelity insurance, which is of recent origin, notice of the fraudulent acts of the employee is of equal, if not greater, importance, for the reason that prompt notification may often enable the insurer to avoid, or secure indemnity for, losses which otherwise would be inevitable or irremediable. The authorities cited by defendant to the effect that the requirement as to notice of loss is a material provision, and must be strictly complied with in order to enable the employer to recover, are numerous. (*Ermentrout* v. *Girard Fire etc. Ins. Co.,* 63 Minn. 305, [56 Am. St. Rep. 485, 30 L. R. A. 346, 65 N. W. 635]; *Quinlan* v. *Providence etc. Ins. Co.,* 133 N. Y. 356, [28 Am. St. Rep. 645, 31 N. E. 31]; *Union Ins. Co.* v. *McGookey,* 33 Ohio St. 555; 2 Wood on Insurance, secs. 436, 437; 2 May on Insurance, sec. 461; *Tayloe* v. *Merchants' Fire Ins. Co.,* 9 How. 403, [13 L. Ed. 187, see, also, Rose's U. S. Notes]).'' The opinion cited further states: ''The allegations of the complaint that the defendant was in May, 1892, fully advised and informed of the breaking of the bond and the loss resulting therefrom do not in my opinion excuse plaintiff's failure to give the prescribed written notice of the fraudulent acts of the employee, and such failure is nonperformance of the contract on the part of plaintiff as to defeat recovery.''

It may be conceded that the insured is not called upon to act on mere suspicion in the matter of giving notice to the insurer; but in this case the plaintiff knew, or had every opportunity of knowing, all the facts early in March, or the 1st of April, 1914, at the latest.

Our conclusions as to the materiality of the requirement to give notice of the facts upon which respondent's claim

is based, and the failure to make a reasonable, or any, compliance with its terms, make it unnecessary to discuss to any extent the other points of appellant's argument. It may be said, however, that while under the terms of the employment of Patterson any ordinary running of a bill at the bar or restaurant of the club, although remaining unpaid, might merely create a debt and not constitute a fraud, the nature and extent of his appropriation and consumption of the supplies of the plaintiff club as shown here, particularly the carrying away of liquors and cigars, are, we believe, such as to justify a finding of fraud and dishonesty in his transactions.

[3] We are satisfied, too, that the court had a right to arrive at an estimate of the amount of Patterson's misappropriations by the method of approximation from the daily average of articles consumed. The fact alone that it is difficult, and perhaps impossible, to reach an accurate accounting, should not deprive the insured of all relief. But the difficulty presented by the finding of the court on this point is that it does not show what proportion of the value taken by Patterson accrued prior to the discovery of his dishonest acts. It is well settled law, and is expressly provided by this policy of insurance, that the insurer shall not be liable for any acts of fraud or dishonesty committed by the employee after the employer shall become aware of any act which may be made the basis of a claim. The court here finds that "subsequent to the first day of July, 1912," the said Walter L. Patterson fraudulently and dishonestly, and contrary to the terms of his agreement, appropriated to his own use the goods and wares of plaintiff to the value of $2,015.08. Patterson's dishonesty was discovered not later than April 1, 1914. He continued in the employ of plaintiff until May 2, 1914. The evidence tends to show that his misappropriations continued throughout his employment. What proportion of the value found by the court accrued after April 1st cannot be determined from the record. The finding is insufficient in this respect.

It is also doubtful if there is any sufficient evidence of nonpayment. The bartenders testified that Patterson paid them something, but not much. As to whether there was ever any settlement with the officers of the club, there is no evidence at all. If the action was against Patterson, the

burden would be upon him to show payment. [4] But in this action against his sureties it is certainly incumbent on plaintiff to show nonpayment. The action is not on the indebtedness of Patterson, but upon a contract to indemnify plaintiff against pecuniary loss from Patterson's dishonesty. The plaintiff must prove his loss, and to do this must establish the fact that Patterson has not paid for the goods taken.

The judgment is reversed.

Finlayson, P. J., and Thomas, J., concurred.