**UNION INDEMNITY CO. v. LANG et al.**

No. 7150.

Circuit Court of Appeals, Ninth Circuit.

June 15, 1934.

Mathes & Sheppard and W. C. Mathes, all of Los Angeles, Cal. (J. Stanley Mullin, of Los Angeles, Cal., of counsel), for appellant.

Joe Crider, Jr., John M. Martin, Frank L. Martin, Jr., and James N. Farley, all of Los Angeles, Cal., for appellees.

Before WILBUR, SAWTELLE, and GARRECHT, Circuit Judges.

SAWTELLE, Circuit Judge.

The suit involved in the present appeal was brought by the appellees to recover from the appellant, as surety, damages sustained by the former as a result of the alleged breach of the obligations of a bond guaranteeing the faithful performance of a subcontract for the welding of a pipe line between Kettleman Hills and Panoche Hills, Cal.

On March 9, 1929, the Pacific Gas & Electric Company, as "owner," entered into a contract with the appellees, as "general contractor," for the construction of a high-pressure gas pipe line approximately 149 miles in length, from Buttonwillow, in Kern county, to Tres Pinos, in San Benito county.

The work was divided into three sections. Section 2, which alone is involved in the present action, was approximately 41 miles long, and extended from Kettleman Hills to Panoche Hills.

On April 11, 1929, the appellees, as general contractor, and Smith and McComber, as "subcontractor," entered into a subcontract whereby the latter firm agreed to do all the welding work on section 2 at the rate of 28⅓ cents per linear foot.

By the terms of the latter contract the appellees were to dig the ditch and lay the pipe on skids, and the subcontractor was then to do everything necessary to the tacking, welding, angling, and the final welding of all pipe and fittings. Thereafter the general contractor was to lower the pipe into the ditch and cover it. The subcontractor agreed to furnish all labor necessary for the welding of the pipe line during the process of welding, tacking, and tying-in, together with all material required therefor, and was to complete the work in accordance with the specifications and conditions of the Pacific Gas & Electric Company.

The subcontract referred to the general contract, and by reference made the latter a part of the former. The subcontract required the subcontractor to furnish a faithful performance bond, and, accordingly, on April 11, 1929, the subcontractor, as principal, and the appellant, as surety, executed in favor of the appellees a bond in the penal sum of $61,300, guaranteeing the faithful performance of the work to be done under the subcontract.

The bond contained the following provisions pertinent to the present controversy:

"1. That, as a condition precedent to the right of recovery hereunder, the Owner shall do and perform each and every of the matters and things set forth and specified in said contract and in this bond, or in either of them, to be by the owner done or performed at the times and in the manner as in said contract and this bond specified. In case of any inconsistency, the provisions of this bond shall take precedence over the provisions of said contract.

"2. That, as a condition precedent to the right of recovery hereunder, the Owner shall notify the Surety, either at its principal office in New Orleans, Louisiana, or at its office in Los Angeles, California, of any breach by the Principal of said contract, and also of any act, or omission, on the part of the Principal, or any agent or employee of the Principal which may cause a loss for which the Surety may become liable hereunder immediately after such breach or act or omission shall have come to the knowledge of the Owner or to any representative of the Owner authorized to supervise the performance of said contract."

Both the general contract and the subcontract provided that the work should be done at an average rate of "not less than three quarters of a mile per working day." The general contract set forth that the contractor was to commence work "as soon as notified by the Company. [Pacific Gas & Electric] so to do and shall prosecute said work simultaneously along the three sections." The subcontract required that the subcontractor should "actually start operations under this contract on or before the 29th day of April, 1929."

Both contracts set forth that "Time shall be the essence of this agreement." This does not only appear in the agreements as a mere pro forma expression, but it is iterated and paraphrased with such emphasis as to leave no doubt regarding the intention of the parties.

Although, as we have seen, the subcontract provided that the subcontractor should actually start operations on or before April 29, Smith and McComber commenced work the early part of May, and were "slow in getting started." Howard Lang, one of the appellees, testified that his firm "kept after" the subcontractor to "speed it up."

On June 7, 1929, Lang had a telephone conversation with R. S. Fuller, engineer of distribution of the Pacific Gas & Electric Company, in which Fuller expressed himself as "very much disgusted" with the lack of progress being shown in connection with the welding. Fuller confirmed the conversation in a letter dated June 8, 1929, in which were contained the following statements:

"The latest reports from the line and my own observations from a visit this past week, convince me that it is going to be extremely difficult to complete the 22" line into the Compressor Station at Kettleman Hills, under the present rate of progress. I therefore urge you with all possible strength to proceed to speed up the work on this line to the utmost.

"I understand that you will have some oxy-acetylene welding crews free to move from the 20" line and I believe they should be moved to the Kettleman Hills Compressor Station end of the 22" to proceed north and complete this work just as soon as possible. I believe you should put on all available welders, of which [whom] you tell me you have several, in order to expedite this work.

"We are all going to be subjected to a very severe criticism if this line is not completed by July first."

As a result of the telephone conversation with Fuller, the appellees, on June 7, wrote to Smith and McComber in part as follows:

"You are advised that you have failed to abide by the terms and specifications of said agreement [the subcontract], in that you have utterly failed to complete three quarters of a mile of welding per day as you have contracted to do; that instead of completing said three quarters of a mile per day you have only averaged approximately two tenths of a mile per day.

"You and each of you will therefore take notice that * * * the Lang Transportation Company, in view of the demand of the Pacific Gas & Electric Company, * * * and your failure to complete said work in the manner provided in the contract hereinbefore referred to, has elected to comply strictly to the terms thereof and hereby notifies you that * * * Lang Transportation Company have elected to immediately exercise that privilege as provided in Paragraph 11, page 5 of said contract and furnish its own crew of men and equipment necessary to complete said pipe line in a workmanlike manner from a point located at Kettleman Hills, * * * to a point north where said workers of the Lang Transportation Company connects [sic] with the pipe line so completed by yourselves; that you shall continue with the welding of said pipe line from a point located at Panoche Hills, * * * south to a point where your workers and pipe line connects [sic] with those workers of the Lang Transportation Company, working north."

The appellees sent a copy of the above letter to the appellant, together with a letter of transmittal dated the same day. This was the first notice received by the appellant from the appellees of any failure on the part of the subcontractor to prosecute the work as required by the terms of the subcontract.

Thereafter the appellees placed their crew on the southern end of section 2 of the pipe line and commenced work. Until about July 20, 1929, both the appellees' crews and the

subcontractor's crews were engaged in the performance of the welding work on that section.

On July 13, 1929, Joe Crider, Jr., attorney for the appellees, sent to the appellant a telegram notifying the surety company that the subcontractor was in default, and demanding that the appellant meet Smith and McComber's pay roll.

On July 15, 1929, the appellees received a telegram from the subcontractor containing the information that the latter was unable to meet labor claims, had turned over its pay roll to the Labor Commission, and was unable to complete the contract. This telegram was confirmed by letter the following day, and still later orally by a member of the subcontractor firm.

The subcontractor finally abandoned the work on or about July 20, 1929, and the appellees completed the welding work on section 2 on or about August 20, 1929.

The present action was commenced by the appellees to recover the cost of completing the work covered by the subcontract, and the amounts paid out for labor and materials for the account of the subcontractor. Judgment was rendered in favor of the appellees for $40,358.99, with interest and costs.

From that judgment the present appeal was taken.

The appellant asserts that the appellees were "far in default in the time for performance of the welding work on Section 2 of the pipe line at the time the subcontract was made on April 11, 1929." In our view of the case, however, it is unnecessary to consider this phase of the case.

We will therefore confine our inquiry to the question of whether or not the appellees failed to notify the surety company of any breach by the subcontractor, "and also of any act, or omission" which might have caused "a loss for which the surety [might] become liable hereunder."

From the appellees' own testimony, it is evident that, almost from the very beginning of their dealings with the subcontractor, they were aware not only of its failure to live up to its business engagements, but also of its essential inability to do so. It is difficult to understand why, knowing the situation as they did, the appellees, as a matter of ordinary business prudence, did not notify the surety of the subcontractor's evident deficiencies. The appellees knew full well that, in case the subcontractor defaulted, they themselves would be held accountable by the Pacific Gas & Electric Company.

Exactly one month before the appellees sent the first notification to the appellant that the subcontractor was not fulfilling its contract, Howard Lang, according to his own testimony, saw that Smith and McComber's welding equipment was not, in his opinion, "sufficient to do three-quarters of a mile of welding per day on this 22 inch line."

This was not a mere vague impression entertained by Lang, but was supported by definite data:

"Smith and McComber had one tractor, a caterpillar tractor, but it had no crane or boom attachment on it with which to handle this pipe. In completing the welding work on Section 2 of the line, Lang Transportation Company used two 60 Best Caterpillars, and even that was not sufficient to enable the reasonable completion of three quarters of a mile of welding of that 22 inch pipe per day."

But the amazing record of the appellees' failure to disclose the facts to the surety company antedates even Lang's observation of the subcontractor's deficiencies as to welding equipment.

Lang testified:

"No welding work was performed by the subcontractors on Section 2 of the line during the month of April, 1929. They started to work in the early part of May and they started pretty slow. We kept after them. Of course we figured they were just getting organized and they were still going pretty slow. Every time I was there I was just right after them to speed it up. * * *

"Smith didn't know anything about welding because he was an operator on the Winnipeg Grain Exchange and this was the first pipe line job he had ever seen or ever been on."

Again Lang testified:

"So we knew every day how much welding Smith and McComber had done. My father and I were in touch with the engineer for Pacific Gas and Electric Company, and, too, we had a general superintendent. * * *

"We observed the organization which Smith and McComber had for doing the work, and the dispatch with which they prosecuted the work during the month of May. Their progress was slow. We noted that. And their organization seemed to be loose. I remember on one occasion I was up there, their key man, a fellow they brought from Texas, had been drunk for several days. Smith

'didn't know what it was all about. * * * McComber had left the job shortly after it started, within two or three weeks after it started, I believe. I am sure it was some time during May, 1929."

In other words, almost from the very beginning the appellees knew that the subcontractor was slow; that it had inadequate equipment; that one partner did not know "what it was about"; that the other partner quit the job shortly after it was commenced; that the firm's "key man" was a drunkard; and that the subcontractor's organization seemed to be "loose."

Yet for more than five weeks from April 29, 1929, the day on which the subcontractor should have commenced its welding work, the appellees said not a word to the appellant.

It is contended, however, that "The surety has not shown that it has been prejudiced in any way whatsoever because the appellees did not give notice prior to June 7, 1929."

It therefore becomes necessary to inquire whether or not, when seasonable notice is made a condition precedent to the surety's liability, the fact that the surety was not prejudiced by its failure to receive such notice is material.

In the instant case, the contract of suretyship was entered into and was to be performed in the state of California. Accordingly, this court will apply the doctrine adopted by the courts of that state.

In Community Bldg. Co. v. Maryland Casualty Co. (C. C. A.) 8 F.(2d) 678, 680, certiorari denied 270 U. S. 652, 46 S. Ct. 351, 70 L. Ed. 782, the late Judge Gilbert, of this court, said:

"From the foregoing considerations we reach the conclusion that, in determining the rights of litigants arising out of a contract of suretyship such as this, made and to be performed in the state of Washington, a federal court should follow the rule established by the highest court of that state."

Citing with approval the foregoing decision by this court, Mr. Justice Sutherland, in Trainor Co. v. Ætna Casualty & Surety Co., 290 U. S. 47, 54, 55, 54 S. Ct. 1, 2, 78 L. Ed. ——, used the following language:

"The Circuit Court of Appeals [62 F.(2d) 487] held that the Pennsylvania decisions merely declared the common law of that state with regard to suretyship, and, since that law is derived from the principles of general jurisprudence common to all the states, a federal court in determining what it is might exercise an independent judgment. We do not deem it necessary to discuss the principle enunciated or to decide whether the Pennsylvania decisions come within it. It is enough to say that even where the principle applies, 'for the sake of harmony and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts if the question seems to them balanced with doubt.' [Cases cited.]"

See, also, Ramsey & Gatlin Construction Co. v. Vincennes Bridge Co., 283 U. S. 796, 797, 51 S. Ct. 484, 75 L. Ed. 1420, where Judge Gilbert's decision was likewise cited with approval, and Consolidated Cut Stone Co. v. Hartford Accident & I. Co. (C. C. A. 10) 62 F.(2d) 975, 976.

There can be no question that the legal principle for which the appellees contend is "balanced with doubt," to say the least. Indeed, the appellees seem to concede that there is conflict among the decisions.

"The cases cited by appellant to the effect that failure to give notice as required by the terms of a bond prevents recovery, are based upon the ancient rule of strictissimi juris. In recent years the courts have been rather reluctant towards applying the rule of strictissimi juris to compensated sureties."

Therefore, under the doctrine approved in the recent Trainor Case, supra, when we find conflict among the decisions of various jurisdictions on the law of suretyship, we are not called upon to determine what is the weight of authority; we must look to the decisions of the highest appellate courts in the state where the contract of suretyship was executed and was to be performed.

In ascertaining the rule in California, however, we need not rely solely upon court decisions; for we find certain statutes to guide us to a proper conclusion.

Dealing with the law of insurance, section 2611 of the Civil Code of California, provides:

"A policy may declare that a violation of specified provisions thereof shall avoid it, otherwise the breach of an immaterial provision does not avoid the policy."

On the subject of guaranty, section 2806 of the same compilation sets forth:

"A guaranty is to be deemed unconditional unless its terms import some condition precedent to the liability of the guarantor."

Section 2840 specifically makes a surety's liability at least no greater than that of a guarantor:

"A surety is exonerated—

"1. In like manner with a guarantor."

Two other pertinent sections follow:

" § 2836. *Limit of surety's obligation.* A surety cannot be held beyond the express terms of his contract, and if such contract prescribes a penalty for its breach, he cannot in any case be liable for more than the penalty.

" § 2837. *Rules of interpretation.* In interpreting the terms of a contract of suretyship, the same rules are to be observed as in the case of other contracts."

The foregoing provisions seem to indicate that the rule of strictissimi juris is to be followed in California in the interpretation of conditions precedent in a contract of suretyship.

The decisions of the highest appellate courts of the state bear out this view.

[2] The case of Roberts v. Security T. & S. Bank, 196 Cal. 557, 564, 566, 238 P. 673, 676, quoted by the appellees themselves, in reality contains considerable language opposed to their contention:

"No principle of law is perhaps better settled than that the liability of a surety is not to be extended by implication beyond the express terms of his contract. Civ. Code, § 2836. * * *

"Our Civil Code, § 2837, provides that, in interpreting the terms of a contract of suretyship, the same rules are to be observed as in the case of other contracts. In Sather Banking Co. v. Briggs Co., 138 Cal. 724, 730, 72 P. 352, 354, this court said: 'While it is true that a surety cannot be held beyond the express terms of his contract, yet in interpreting the terms of a contract of suretyship, the same rules are to be observed as in the case of other contracts. Such construction does not mean that words are to be distorted out of their natural meaning, or that, by implication, something can be read into the contract that it will not reasonably bear; but it means that the contract shall be fairly construed with a view to effect the object for which it was given, and to accomplish the purpose for which it was designed. The old rule of strictissimi juris applies only to the extent, that no implication shall be indulged in to impose a burden not clearly inferable from the language of the contract, but does not apply so as to hold that the contract shall not be reasonably interpreted as other contracts are.' "

Applying the foregoing language to the contract of suretyship that we are now considering, we are impelled to the conclusion that the rule of strictissimi juris should govern here. To read into the provision, "That,

as a condition precedent to the right of recovery hereunder, the Owner shall notify the Surety," etc., the qualification that notice is a condition precedent to the surety's liability *only* if the surety is prejudiced by failure to receive such notice, is, we believe, attempting to hold the surety "beyond the express terms of his contract," "distorting words beyond their natural meaning," reading something "into the contract that it will not reasonably bear," and imposing "a burden not clearly inferable from the language of the contract." See, also, Llewellyn Iron Works v. Reed, 123 Cal. App. 607, 613, 11 P.(2d) 657.

Early in the history of California jurisprudence, the Supreme Court of the state indicated its adherence to the principle of strictissimi juris in construing contracts in the nature of suretyships. In Bensley v. Atwill, 12 Cal. 231, 239, 240, the court said:

"Courts do not make contracts for men. They are supposed to be able to make contracts for themselves; and we do not see, if a man chooses to bind himself to pay money on a particular event why he may not, also, as well give character to that event, and mark and describe it, and hold himself only bound by or after the event so defined; or, in other words, why, if he were only bound, upon eviction of his grantee, to pay money, he may not, by express agreement, limit the obligation to an eviction after reasonable notice to him. * * *

"Nor does it matter of what value this notice was to the defendant, or whether it was of any value. In a Court of law, effect is to be given to the bargain according to its terms, and Courts of law cannot speculate upon the weight attached to one or another of the elements of an obligation. The defendant bound himself only in a given way, and can be held only by the bargain he made, at least in the form of this action."

The same rule has been repeatedly stated in negative form by the Supreme Court of California. In Carpenter v. Furrey, 128 Cal. 665, 668, 61 P. 369, 370, it was said:

"Nor, in the absence of a contract to that effect, is a notice ever required to fix the liability of either a surety or guarantor."

See, also, Coburn v. Brooks, 78 Cal. 443, 447, 21 P. 2; Treweek v. Howard, 105 Cal. 434, 441, 39 P. 20.

In Schwab v. Bridge, 27 Cal. App. 204, 206, 207, 149 P. 603, 604, the doctrine of strictissimi juris with reference to conditions precedent as to notice and other matters, was emphatically elaborated upon by the court:

"A contract of suretyship is to be construed the same as other contracts for the purpose of determining the intention of the parties. To ascertain this intent resort is first had to the contract itself; and if the intention of the parties is doubtful under the terms of the instrument, resort may be had to the surrounding circumstances to determine its meaning. Here the words employed are in themselves express and precise, and clearly support the contention of the defendant, that presentation of the account due and within the time specified was intended as a condition precedent. · The language of the proviso expressly declares that liability will accrue, provided the amount may be due and presented December 3, 1905. *Where a contract of suretyship stipulates that notice shall be given to the surety of the principal's default, failure to comply with the condition or to give notice within the time specified will prevent recovery from the surety* (United States Fidelity & G. Co. v. Rice, 148 F. 206, 78 C. C. A. 164; 32 Cyc. 176, and cases cited). While it is true that conditions precedent are not favored by the law, and are to be strictly construed against one seeking to avail himself of them (Antonelle v. Kennedy & Shaw Lumber Co., 140 Cal. 309–315, 73 P. 966), it is equally true that parties to a contract may, if they think proper, agree that any matter shall be a condition precedent; and if words are used in the contract so precise, express, and strong that such intention only is compatible with the terms employed, a court can only give effect to such declared intention of the parties. The only question in every case is whether such intention is so declared; and where such intention is sufficiently expressed to make the fulfillment of the act a condition precedent, it will be one. 2 Elliott on Contracts, § 1580; National Surety Co. v. Long, 125 F. 887, 60 C. C. A. 623." (Italics our own.)

See, also, Los Angeles Athletic Club ·v. Fidelity, etc., Co., 41 Cal. App. 439, 446, 183 P. 174; Easton v. Boston Investment Co., 51 Cal. App. 246, 249, 250, 196 P. 796.

The only California case referred to by the appellees in connection with the question of notice as a condition precedent is Sherman v. American Surety Co., 178 Cal. 286, 290, 291, 173 P. 161, 162,·from which the following language is quoted in the brief:

"The principle to be deduced from these and other like decisions is that in so construing the bond no hardship is imposed upon the . surety since in entering into the contract it ·is deemed chargeable with notice, not only of the financial ability and integrity of the con-

tractor, but with notice as to whether he possesses the plant, equipment, and tools required in doing the particular work, or will be compelled to rent and hire the same or some part .thereof, all of which matters are factors to be considered in determining the risk and upon which the surety fixes the premium exacted for executing the bond."

But a study of the foregoing decision discloses that it is in no way apposite here. The language quoted had no reference to notice of default as a condition precedent, but was used in discussing the surety's contention that the words "materials or supplies," as used in a statute, "should be construed as referring only to those things which enter into and become component parts of the completed structure."

▮ We believe that the decisions of the highest courts of California have recognized the principle of strictissimi juris in connection with notice of default, breach, or any act or omission that might cause a loss for which the surety·might become liable, regardless of whether or not the surety has been in fact prejudiced by failure to receive such notice.

Since, therefore, the appellees were well aware of the various acts and omissions of the subcontractor that might cause a loss for which the surety might become liable and for five weeks failed to notify the surety of such acts and omissions, we hold that the appellees failed to comply with a condition precedent of the bond, and cannot recover thereon.

Accordingly, the judgment of the court below is reversed.