[Civ. No. 7566. First Appellate District, Division One.—July 23, 1931.]

PACIFIC COAST ADJUSTMENT BUREAU (a Corporation), Respondent, v. INDEMNITY INSURANCE COMPANY OF NORTH AMERICA (a Corporation), Appellant.

Hartley F. Peart and Sylvester J. McAtee for Appellant.

Percy V. Long and Bert W. Levit for Respondent.

WARD, J., *pro tem.*—This is an action based upon a bond issued by the appellant Indemnity Insurance Company of North America to the respondent whereby appellant bound itself to pay to the respondent "any direct financial loss, that it may sustain by reason of any act of larceny, embezzlement, theft or any other fraudulent or dishonest act, wrongful abstraction or wilful misapplication", committed during the term of the bond by any employee covered by the schedule attached to the bond. A jury returned a verdict for plaintiff. Judgment was entered with certain interest and defendant appealed. The bond provided: "When the Assured discovers a loss hereunder, written notice of same shall be delivered to the Company and within ninety (90) days thereafter an itemized statement of claim shall be furnished to the Company. . . . This bond shall terminate, as to any employee, upon the discovery by the Assured of a loss through or on account of such employee."

Respondent is engaged in the adjustment of losses for insurance companies. Its main office is in San Francisco, but it has branch offices located at points throughout the western states. Each branch office is in charge of a branch manager, and at each branch are located one or more adjusters and clerical help. The method of financing the branches was as follows: The branch manager had authority to draw drafts upon the head office of respondent, whereby he obtained the necessary funds for operating the branch office. Each branch manager was permitted to draw what he thought would be needed for the operation of his branch, and he was instructed not to draw too heavily in the early part of the month. The funds so obtained were used to pay all the expenses of the branch, including the branch manager's salary. The funds drawn were charged to each branch manager personally, and it was not required that they be kept in bank in the name of respondent. At the end of each month each branch manager would submit to

the head office an account wherein would be shown the amount of money received from the head office through the medium of drafts, a detailed itemization of all expenditures, and the balance due to the head office. A check for this balance payable to respondent was required to accompany the statement of account.

An employee, Pixler, was the agent of respondent at Boise, Idaho, from December, 1924, until July of 1926. Pixler was covered by the schedule attached to the bond. In the early part of 1925 Pixler, to meet certain payments on his property, etc., was permitted by the respondent to draw on his salary for the succeeding month. In June of the same year, Pixler drew a draft for $1,000 after having drawn one for $350. The home office withheld payment pending explanation by Pixler. It subsequently developed that $400 was used for Pixler's personal use, which was returned at the end of June. In April, 1926, Pixler drew a draft for $1200, part of which was used for Pixler's doctor's and hospital expenses. This brought from the home office a wire to Pixler that he had exceeded his authority and that no consent would be forthcoming for use of money beyond business requirements and necessities. Pixler accounted for the money at the end of the month. The adjustment company did not give notice to the bonding company of this transaction. During the first twelve days of July, 1926, Pixler drew on respondent for $2,450, upon which the verdict of the jury for $1943 in favor of respondent was based. Respondent notified the bank at Boise City that a certain draft, a part of the $2,450, would not be honored, pending satisfactory advices from Pixler. Subsequently Pixler resigned. An accountant examined the books; appellant was notified of the result of the examination and the filing of this action followed.

The principal point in this case is whether there was discovery by respondent of the loss, on account of Pixler's financial transactions, prior to July, 1926. As used in the bond, the word "loss" has reference only to a wrongful abstraction, wilful misapplication, or a fraudulent or dishonest act, such as larceny, embezzlement, or theft. "Abstraction is taking from with intent to injure or defraud." (Words and Phrases, 3d ser.) Wrongful abstraction has been defined as "an unauthorized and illegal taking or

withdrawing of funds, etc., and the appropriation of such funds or securities to the benefit of the taker''. (*Chapman* v. *Nieman,* (Tex. Civ. App.) 276 S. W. 302, at 303.) ''Willful misapplication means a willful, unauthorized, and illegal application of the funds of the bank to the use and benefit of the employee.'' (*Chapman* v. *Nieman, supra.*) In defining wilful misapplication, Words and Phrases (3d ser.), uses the following language: ''The intent to injure and defraud which is essential does not necessarily involve malice or ill will, but merely the general intent to injure and defraud which always arises in contemplation of law when one willfully or intentionally does that which is illegal and fraudulent.'' The controlling element in all of the enumerated acts set forth in the bond is fraud. If the use of the money obtained by the drafts simply created an indebtedness from Pixler to the respondent and did not constitute a fraud, then it would be unnecessary to report such transactions to the bonding company. ''The insured is not called upon to act on mere suspicion in the matter of giving notice to the insurer; ... '' (See *Los Angeles Athletic Club* v. *United States Fidelity & Guarantee Co.,* 41 Cal. App. 446, 447 [183 Pac. 174, 177].) Though respondent cautioned Pixler not to draw in excess of his necessary business needs and though he was plainly told that respondent's funds were not to be used for personal use, nevertheless, it is plain that respondent did not treat the use of such funds for personal expenses as anything more than an indebtedness, which in their minds did not arise to the enormity of a fraud. We find this position somewhat justifiable in view of the fact that from January, 1925, until June, 1926, the money was accounted for at the end of each month. It is true respondent had opportunity of investigation and means of knowledge, but the apparently frank statements of Pixler and the return of the funds at the designated periods was evidently sufficient to warrant the jury in finding that respondent did not discover, that is, that actual knowledge of fraud was not apparent until July, 1926. ''It is held that these provisions (requiring the obligee to notify the surety promptly of any act of fraud or dishonesty) do not enlarge the duty of the obligee when no special stipulation is made for the exercise of diligence in supervising the conduct of the principal, and

that the covenant that the obligee shall at once notify the surety of any act of fraud or dishonesty on the part of the principal, only covers such acts as are actually known to the employer, and not those he might have known by the exercise of diligence." (Stearns on Suretyship, 3d ed., 420; *Perpetual Building & Loan Assn.* v. *United States Fidelity & Guarantee Co.*, 118 Iowa, 729 [92 N. W. 686].)

In view of the foregoing facts and the conclusions reached thereon the motion for a nonsuit was properly denied. What has been said heretofore answers the contentions of appellant relative to the instructions given and refused.

■ Appellant contends that a remark made by the court was an abuse of discretion and prejudicial to defendant's position. The record does not indicate that any objection, assignment of misconduct, or motion to strike out, or motion to instruct the jury to disregard the remark was made. We are satisfied that the remark was not intended to and did not sway the jury upon any phase of the issues involved in this case.

■ Upon motion of respondent after verdict and judgment, the court made an order amending the judgment, on the verdict, by allowing interest upon the amount of the judgment from August 11, 1926, the date upon which the proof of loss was filed. Appellant contends that plaintiff was not entitled to interest, as a matter of law, for the reason that the recovery sought was not for sums capable of being made certain by calculation. The case of *Perry* v. *Magneson*, 207 Cal. 617 [279 Pac. 650], relied upon by appellant, was a matter wherein the court had to determine the cost of completing a building. The amount was not fixed. In this case the amount was made certain in the proof of loss. No claim of its uncertainty was made during the trial. "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, . . . " (Civ. Code, sec. 3287.) The bond provided: "Third: When the Assured discovers a loss hereunder written notice of same shall be delivered to the Company and within ninety (90) days thereafter an itemized statement of claim shall be furnished to the company." The proof of loss was filed August 11, 1926, and

interest was properly allowed from that date. There was no issue of fact as to interest and the court had the right to amend the judgment. (See *Engleberg* v. *Sebastiani,* 207 Cal. 729 [279 Pac. 795].)

Judgment affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 21, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 21, 1931.

Seawell, J., and Langdon, J., dissented.