American Surety Co. of N. Y., Appellant, v. Meadville Lodge No. 219, Elks.

452

. Argued April 13, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker, and James, JJ.

*Dickson Andrews,* for appellant.

*Frank J. Thomas,* and with him *Paul E. Thomas* of *Thomas & Thomas,* for appellee.

Opinion by Cunningham, J., October 3, 1934:
This case presents the novel situation of a surety

company asserting that the condition of its bond was broken, while the insured, although it collected the penalty, insists that no breach occurred with respect to the largest item in its claim for loss.

The appellant, American Surety Company of New York, gave the appellee, the Meadville Lodge of the Order of Elks, a surety bond agreeing to indemnify it against any loss of its funds or property, "by reason of any act or acts of fraud or dishonesty, including forgery, theft, embezzlement, or wrongful abstraction" on the part of its secretary or treasurer to the extent of $1,000 as to each officer. The condition of the bond upon which this suit is based is that contained in Section 9, reading:

"9. If the order sustain a loss within the terms of this obligation in excess of the amount of suretyship specified, the order shall be entitled to share in any net recovery made by the surety in the proportion that the order's excess loss bears to the total loss; *and, likewise, the surety shall be entitled to share in any net recovery made by the order in the proportion that the surety's loss bears to the order's total loss,* excepting such recovery made by reason of this or other suretyship." (Italics supplied.)

Relying upon this latter clause, the statement of claim averred that, while the bond was in effect, Daniel H. Weber, the treasurer of the lodge, over a period of time extending from March 11, 1925, to October 23, 1929, defaulted in accounting for the funds of the lodge in his possession, with a resultant net loss to the lodge in the sum of $8,696.32; that included in the deficit was a certain item of $5,000 which he had wrongfully abstracted from the funds of the lodge and had misapplied to the use of the Greendale Cemetery Association, of which he was secretary; that on February 6, 1931, appellant paid to the lodge the sum of $1,000 in full payment of its obligation; and that on

February 13, 1931, the lodge recovered from the cemetery association the $5,000 which had been applied to the latter's use. Claim was accordingly made for the sum of $574.95, being that proportion of $5,000 which the amount paid by appellant bore to the total default.

The affidavit of defense admitted there was an apparent shortage in Weber's accounts of $8,696.32, but averred that the $5,000 item had not been wrongfully abstracted from the lodge's funds and wilfully applied to the account of the cemetery association, but was credited to the account of the latter through error or mistake. It further averred that the cemetery association admitted the $5,000 item was in excess of any sum due it by Weber, and that appellant's adjuster had been informed, prior to the payment of the claim, that the cemetery association did not claim title to this money but conceded it was the property of the lodge, and that the association had agreed to turn the money over to the lodge when proper assurances were given that it would be relieved from liability for making such payment. The affidavit concluded with a denial that there had been a "recovery" within the meaning of the bond.

Testimony in explanation of the transaction was given at the trial by the officers of the lodge and of the cemetery association, as well as by Weber himself. As it developed, there was practically no dispute in the evidence with relation to the controlling facts. The real controversy relates to the legal conclusions to be drawn from those facts. It is undisputed that, between the dates indicated, Weber transferred approximately $6,000 of the lodge's funds to the account of the cemetery association. Of this sum, $1,000 was later paid back. He testified that the money was used to meet an outstanding check or checks that had been given to pay a debt of the cemetery association; that

he knew of considerable sums of money which were due it by certain funeral directors, and that he intended to replace the funds so used when these debts were collected. He did not, however, make such replacement. At some time in 1929, Weber told certain officers of the cemetery association that $5,000 of the funds in their hands belonged to the lodge. These officers, in turn, passed this information on to the officials of the lodge. John E. Reynolds, treasurer of the association, when asked whether it claimed that money at any time, replied: "No, we did not claim it after we knew that it was theirs. We were in—the books were in such condition that we did not know that $5,000, whether the Elks money or not, but we believed, I believed at that time that there was money that belonged to the Elks, and was more money than we could account for." When asked why the money had not been turned over to the lodge, he answered: "The reason was, that we were not sure where it came from or how much it was, and we wanted to wait until we had the complete audit, as far as possible, of the cemetery association affairs, ......"

There was further testimony that another bonding company, which was Weber's surety on a guardian's bond, had also requested that the money should not be paid over until it had made an investigation of Weber's accounts as guardian. The cemetery association then consulted its attorney, and was advised that it could protect itself either by taking a bond of indemnity or by paying the fund into court.

Meanwhile, the lodge caused an investigation to be made of its own accounts. As a result of this, it got in touch with appellant and, after a preliminary interview, had a conference with an investigator for appellant on January 13, 1931. At this meeting, according to the testimony of the lodge's officers, the investigator was told that there was a deficit, but that of this sum

$5,000 was in the hands of the cemetery association and that they believed it would be recovered, although difficulties had arisen in view of the claims against the fund. The following quotation from the testimony of the lodge's counsel gives the most detailed version of the conference from the defendant's standpoint:

"A. I told Mr. Carrington [appellant's investigator] that I had consulted Mr. John E. Reynolds of the cemetery association; also Mr. Percy Cullum. That they had both told me that the association had in its possession $5,000 of funds which they did not claim, and that Mr. Dan Weber had reported to them that it was the funds of the Elks Lodge. I told him that I had also consulted Mr. Dan Weber and he told me that it was fund of the Elks Lodge, which had been credited to the Greendale Cemetery Association. That he claimed to me that it had been put there through error or mistake. I told him that I had consulted Mr. Reynolds, or both him and Mr. Cullum, (I don't know whether I told him one or the other), as to the possibility of having that money turned over to Mr. Reynolds. I said that they did not recognize it as their money and believed it was the property of the Elks. That they were willing to turn it over, but that Mr. Leland Culbertson had instructed them not to do so until he could determine whether or not any of that money belonged to the Emma Harper estate. That I had also seen Mr. Culbertson and asked him if he had any claim or evidence that that belonged to the Harper estate, and Mr. Culbertson told me that he had no evidence of it, but he wanted it held up until Mr. Weber would file an account in the Harper estate. And I told him that Mr. Reynolds had said they wanted to be protected and I told him that they could be protected either by accepting the Elks' bond, indemnity bond, or else they could go into court and pay the money into court, disclaiming ownership of it, and letting the par-

ties that were claiming, determine that in a feigned issue.

"I said that from what had been told us, it did not seem there was a possibility of doubt but that we would recover the $5,000; that [that] would leave a surety for which the American Surety Company was liable, for the difference between eighty-six hundred and some dollars and five thousand dollars or thirty-six hundred and some dollars.

"We visited quite a while, talked this matter over, repeated many of the matters, and I recollect very distinctly, Mr. Carrington said, that he would recommend that the company pay the $1,000 as there evidently was more than that short, and they would 'pay it and forget it.' "

The testimony of the investigator did not differ substantially. He denied, however, that he said he would recommend that the appellant "pay the claim and forget it," but agreed he was then told there was a dispute as to a sum of $5,000 in the accounts of the cemetery association and that there was a claim against that fund by the surety on Weber's bond as guardian.

On January 23, 1931, the secretary of the defendant presented to appellant a sworn statement of the lodge's loss "in the matter of the default of Daniel H. Weber." The statement shows all items of cash or securities coming into the "defaulter's" hands for the period March 11, 1925—October 23, 1929, credits him with all items returned to the lodge, and shows a balance due it of $8,696.32, which is stated to be "the true net loss resulting from said default." The disputed item of $5,000 was concededly included in the claim. Appellant thereupon paid the lodge $1,000 (the face of the bond) on February 6, 1931. On February 13th of the same year, the cemetery association paid over the sum of $5,000 to the lodge in return for an

indemnity bond and a document releasing Weber from all liability.

The learned trial judge charged the jury that they were to determine, first, whether Weber, in placing the sum of $5,000 in the account of the cemetery association, had committed a breach of the bond; and second, if there was a breach, whether a recovery had been had within the meaning of Section 9. At the request of counsel for the lodge, he also affirmed the following points for charge:

"1. If the jury shall find from the evidence that the agent of the plaintiff, Mr. Carrington, was informed by the defendant's representative, that the $5,000 thereafter paid to the defendant by the Greendale Cemetery Association was the money of defendant in the hands of said cemetery association, which recognized that the defendant was the owner thereof, and that said sum was included in the alleged reported shortage of Daniel H. Weber in the sum of $8,696.32, and that plaintiff paid to defendant the $1,000 on its bond, with the knowledge that said $5,000 was included in said reported shortage, and that defendant was then relying on payment to it by said Greendale Cemetery Association, the verdict should be for the defendant.

"2. If the jury should find from the evidence that the $5,000 in the possession of Greendale Cemetery Association, and which was paid to defendant, was admitted and recognized by Daniel H. Weber, treasurer, the cemetery association and the defendant, that same was the property of the defendant, and said information was reported to plaintiff through its agent, prior to time plaintiff paid the $1,000, there was then no loss sustained under the bond so far as it relates to said $5,000."

As a result of this charge, the jury returned a verdict for defendant. Appellant now appeals from the

judgment entered thereon and assigns as error the refusal of the court to direct a verdict in its favor, and also its affirmance of defendant's points as quoted. In our opinion, the charge contains errors which require a reversal of the judgment.

We agree with appellant that the acts of Weber in placing the funds of the lodge in the account of the cemetery association constituted, under the admitted circumstances, a "wrongful abstraction" within the meaning of the bond. It is clear, despite the averments of the affidavit of defense, that this action was not the result of error or mistake. It is not questioned that the securities of the lodge were converted and their proceeds purposely and deliberately transferred in order that certain debts of the cemetery association might be paid. This obviously constituted a wrongful abstraction if the term is to receive a common-sense construction. It may be true that Weber intended to have the money paid back to its rightful owner. It was not essential that the evidence, in this case, should show beyond a reasonable doubt that his motive was technically criminal; the language of the bond did not require such proof in order to establish the liability of the surety. The fact remains that the money was taken from its owner and put in the custody and control of another and used for the latter's benefit. It is just such loss of control and dishonesty that such bonds are intended to insure against. Had the funds of the cemetery association been dissipated before recovery was had, undoubtedly the Lodge would have been the first to claim that there had been a wrongful abstraction. The language of the bond is not ambiguous. Manifestly, it was an "abstraction" to take the funds in question out of the lodge's account; it was clearly "wrongful" to devote them to the use, and to the sole benefit, of a third party.

In our opinion the trial judge was not justified in

submitting to the jury the question whether there had been a breach of the bond. That was not an open question at this trial; it had already been settled by the parties. The defendant had prosecuted Weber in the criminal courts, charging him with "unlawful conversion" of its money and with larceny as a bailee; it had claimed from his surety the full penalty of its bond upon the sworn representation that he was a "defaulter" and that it had suffered a loss (in which the $5,000 was included) through his "default." The plaintiff accepted these representations as true and paid the penalty it had agreed to pay for "any act or acts of fraud or dishonesty" upon the part of Weber. After all this and with the penalty in its treasury, it is merely trifling with words for defendant to aver, when called upon to comply with its part of the contract, that Weber's acts were mere "errors or mistakes" and not fraudulent or dishonest.

The second question is whether there was a "recovery" within the meaning of the bond. Appellee makes an earnest argument to the effect that there was no recovery in the normal sense of the term. It points out that the fund was known to be in the hands of the cemetery association; that the cemetery association was willing to pay over the fund when it was properly indemnified; and that appellant knew of this fact before it paid the claim. This argument, however, disregards the effect of the proof of loss. The obligation of the surety was subject, among others, to the following conditions: "Claim, if any, for such loss must be delivered in like manner [i. e. in writing] within three calendar months after such discovery, [of the loss] accompanied by a statement in detail, verified under oath by the principal executive officer or the secretary of the order." Payment of the claim is based upon the facts furnished in such statement. In this case the claim actually presented showed a

deficit of $8,696.32. This was sworn to be "the true net loss resulting from said default between March 11, 1925, and October 23, 1929." Included in the claim, without comment or explanation, was the sum of $5,000 which Weber had abstracted and misapplied to the use of the cemetery association. It is difficult, in view of this sworn statement, to understand how appellee can now assert there was no "loss" of this money.

It is true, as argued, that proofs of loss are not conclusive, nor is the party filing them estopped from explaining or even contradicting them. But Mr. Detweiler, who, as secretary of the lodge, swore to the proofs of loss and delivered them to appellant, made no attempt, in his testimony, to correct or contradict them. All that was shown was that verbal information with respect to the attitude of the cemetery association was given appellant's investigator prior to the filing of the formal proofs.

It must be kept in mind that bonding companies pay claims upon the facts presented in such proofs, and they, therefore, have a right to require, and to expect, the facts to be correctly stated.

When the insured was about to file its proofs of loss, the situation with respect to the $5,000 item was uncertain. It was not definitely known that the money would be returned by the cemetery association. The lodge, therefore, had two alternatives. It could make a claim for only $3,696.32, in which event it would not be under any obligation to share the $5,000 with appellant, if and when it was recovered. Of course, if it adopted this method it ran the risk of having some, or all, of the items included in the $3,696 questioned by appellant as not covered by the bond; but by including the $5,000 item it knew that payment of the face of the bond might well be authorized upon that item alone. It cannot take both positions, as it

is now attempting to do; it cannot blow hot and cold; it cannot claim the protection of the bond as to the $5,000 item when advantageous so to do and then, after the item has been recovered, repudiate its attendant obligation to share the amount so recovered with appellant.

It also seems immaterial to us that the surety company knew that the $5,000 might be recovered in the future. In many similar instances, it must be apparent that there is a possibility of some recovery through tracing the misappropriated funds. It cannot be said, however, that the mere knowledge of the existence of such a possibility, or even probability, precludes the surety company from insisting that the restoration of the funds be treated as a recovery under the bond. If it does, it is difficult to see how any court could draw reasonable distinctions between the different degrees of such a possibility. The recovery provision is plain upon its face, and we see no reason why it should not be given full effect in this case.

We do not mean by this to intimate that an insured must share with the surety the amount "recovered" on an item for which the surety is not responsible under the terms of its contract. If an item should be erroneously included in the proofs of loss which is not covered by the terms of the bond, the surety cannot share in its subsequent recovery, because such item would not be a "loss" within the meaning of the bond. The proofs of loss would be open to such an explanation. Where, however, as here, the item for which claim is made is covered by the bond, it must, by the same reasoning, be considered subject to the recovery clause.

For the reasons stated, the second and third assignments, charging error in affirming the defendant's first and second points, must be sustained.

Complaint is also made of the refusal of appellant's

point for binding instructions. The situation here differs from the status which existed at the conclusion of the trial in the case of Nanty-Glo Boro. v. American Surety Co. 309 Pa. 236, 163 A. 523. It was there held that when the evidence upon which a plaintiff must rely is oral, the credibility of the witnesses is for the jury and the case must be submitted, although the defendant has offered no evidence. In the present case, the fundamental and controlling fact, viz., that the $5,000 item had been paid back to the insured by the cemetery association, was not merely uncontroverted by the defendant. It did not remain silent; it proved that fact just as affirmatively as did the plaintiff. The only open question, therefore, was one of law, relating to the legal effect upon the rights and the obligations of the defendant flowing from its admitted receipt of the money. The trial judge should have held, as a matter of law, that the receipt of that money constituted a "recovery," within the meaning of the contract, and should have instructed the jury to return a verdict in favor of the plaintiff for the amount of its claim, with interest.

The judgment for the defendant is reversed and judgment is here entered in favor of the plaintiff for $574.95 with interest from February 13, 1931.