GEORGIA CASUALTY AND SURETY COMPANY

v.

SEABOARD SURETY COMPANY.

Civ. A. No. 7380.

United States District Court
N. D. Georgia,
Atlanta Division.

Nov. 9, 1962.

Crenshaw, Hansell, Ware, Brandon & Dorsey, Atlanta, Ga., for plaintiff.

Smith, Field, Ringel, Martin & Carr, Atlanta, Ga., for defendants.

MORGAN, District Judge.

This is an action on a contract brought by the plaintiff, Georgia Casualty and Surety Company, a Georgia corporation, upon a comprehensive blanket insurance policy issued by the defendant, Seaboard Surety Company, a non-resident corporation, and liability is asserted under three separate insuring agreements set forth in the blanket policy.

First, liability is asserted under the terms of Insuring Agreement No. 1 in which the defendant contracted and agreed to insure plaintiff against:

"Loss through any fraudulent, dishonest or criminal act (except when such criminal act arises out of malicious mischief or vandalism) committed, whether alone or in collusion with others, by any employee (wherever located) while in the service of the insured or within thirty (30) days after discontinuance of such service (except when discontinuance is caused by application of Section 8 (2) hereof). 'Employee' means and includes officers, clerks, and other persons in the Insured's direct employ, but does not include brokers, factors, commission merchants, or other agents or representatives or any person not in the direct employ of the Insured."

Liability under this Insuring Agreement is predicated upon the contention that three individuals, Paul Temple, Roy E. Bishop, and Eva Woodall, were officers of the plaintiff corporation and that certain fraudulent and dishonest acts of these individuals, as described in the Statement of Facts set out below, were within the coverage of this Insuring Agreement.

Second, liability is asserted under the terms of Insuring Agreement No. 2, in which the defendant contracted and agreed to insure the plaintiff against:

"Loss of MONEY AND/OR SECURITIES, meaning negotiable and non-negotiable instruments, documents and contracts representing money or property, through damage, destruction, disappearance or wrongful abstraction, including loss of subscription, conversion, redemption or deposit privileges through the loss or misplacement of such Securities; provided, such Money and/or Securities belong to, or are held by the Insured in any capacity, whether or not the Insured is legally liable therefor and, provided further, such Money and/or Securities are actually within any premises of the Insured or are within the premises of any

banking institution, transfer or registration agent or within any recognized place of safe deposit or are in transit outside such premises, while in the custody or home of an employee or while being conveyed by any armoured motor vehicle company."

Liability under this Insuring Agreement is predicated upon the contention that the fraudulent and dishonest misappropriations effected by Temple, Bishop and Woodall constitute "wrongful abstractions" within the coverage of this Insuring Agreement.

Third, liability is asserted under the terms of Insuring Agreement No. 4, in which the defendant contracted and agreed to insure the plaintiff against:

"Loss through forgery or alteration of any instrument drawn by or drawn upon, or purported to have been drawn by or drawn upon the insured or any corporate officer or partner of the insured for his own account."

Liability under this Insuring Agreement is predicated upon the contention that certain certified copies of corporate resolutions, notes, endorsements, and other instruments as more particularly described in the Statement of Facts set out below, were falsely made and constituted forgeries within the definition of that term as used in the policy.

The plaintiff further contends that the refusal to pay of the defendant surety company was in bad faith and that, for that reason, the defendant surety company is liable to plaintiff for damages in the amount of 25 percent and for reasonable attorneys' fees for prosecution of this case, as set out and provided for in Section 56–1206 of the Georgia Code.

### STATEMENT OF FACTS

In the fall of 1959, Paul Temple negotiated with Messrs. D. D. Dominey, Sr., and J. Austin Dilbeck for the purchase of approximately 200,000 shares of stock owned by Messrs. Dominey, Sr., and Dilbeck and associates in Georgia Casualty and Surety Company, and in December, 1959, the parties agreed on a formal contract of purchase, identical with the contract identified as Plaintiff's Exhibit No. 4, except that Investors Finance & Thrift Corporation was a party to the contract and agreed therein to guarantee performance by Thrift Corporation of America as provided in the deleted portion of said contract as shown in Plaintiff's Exhibit No. 4.

In the course of negotiations for the purchase of this stock, it was represented by Mr. Temple that the stock was being acquired to effectuate a merger with Eagle Fire Insurance Company of Newark, New Jersey, pursuant to a plan of merger which had been approved by the Directors of the Eagle Fire Insurance Company. The representation that the proposed plan of merger had been approved by the Directors of Eagle Fire Insurance Company was false.

On January 14, 1960, Mr. Temple came to Atlanta and informed Messrs. Dominey, Sr., and Dilbeck that the proposed contract could not be executed by Investors Finance & Thrift Corporation. He explained that Investors Finance & Thrift Corporation could not be a party to the contract for the reason that they were then in the process of making a filing with the Securities Exchange Commission and that assumption of the obligations set out in the contract would complicate the pending registration. At the same time he represented that Investors Finance had placed, or guaranteed to place, in Thrift Corporation of America the sum of $2,700,000 and that the funds for the purchase of the stock of Messrs. Dominey, Sr., and Dilbeck and their associates and the treasury stock provided for in the proposed agreement would be available from that source. This representation was false and Investors Finance & Thrift Corporation had made no commitment to make any such sum available to Thrift Corporation of America.

A meeting of the Board of Directors of Georgia Casualty and Surety Company had previously been planned for January 15, 1960, but on January 14, 1960, it was

explained to Mr. Temple that the meeting of the Board of Directors could not be arranged for January 15th, and it was determined that the meeting should be postponed and held on January 18, 1960, and the Directors were so informed.

Plaintiff, on January 18, 1960, was governed by a Board of Directors consisting of fourteen members. D. D. Dominey, Sr., and J. Austin Dilbeck were the chief administrative executive officers and/or controlled a majority of the stock issued by the plaintiff.

On January 18, 1960, the said Board of Directors, at a special meeting, adopted a resolution that the plaintiff corporation sell.190,000 shares of its corporate stock at $5.00 per share "with the understanding that the contracts must also be performed by a buyer, the buyer being Thrift Corporation of America"; and, at this meeting, eight additional directors were elected, including Paul Temple, Roy E. Bishop, and Eva Woodall. The meeting was recessed at 12:00 Noon to reconvene at 2:30 P.M., at Paul Temple's hotel room, to be continued with the newly elected Board members. (The copy of the minutes of the special meeting of January 18, 1960, is marked as Defendant's Exhibit No. 27).

The Board of Directors of the plaintiff and its Executive Committee also unanimously elected Messrs. Temple and Bishop and Miss Woodall, and five other individuals designated by them, to the Board of Directors of Georgia Casualty and Surety Company, and before the meeting recessed, all the old directors of plaintiff tendered their resignations.

None of the eight individuals who were elected to the Board of Directors at said meeting, other than Temple, Bishop and Woodall, had ever agreed to serve as members of the Board of Directors, and none of them ever did so. These five individuals, upon being advised of their purported election to plaintiff's Board, stated that such action was taken without their knowledge or consent, and that they had not purported to serve and did not purport to serve as members of the Board of Directors of said corporation.

There is no record of the minutes of the purported reconvened meeting in the room of Temple at the Piedmont Hotel, other than a memo, dated January 19, 1960, purportedly signed by Eva Woodall, Secretary, noting that the Board of Directors had reconvened at 2:30 P.M., on January 18, 1960, at the Piedmont Hotel, and that her notes of the minutes of said reconvened meeting were in the process of being transcribed into the Minute Book. A certified copy of said memorandum is set out as a part of Plaintiff's Exhibit 3. There are no other minutes with respect to such meeting in the Minute Book, but Eva Woodall, as Secretary of the corporation, has certified over the seal of the corporation that various resolutions, more particularly referred to hereafter, were adopted at said meeting and appeared in the minutes of said meeting.

After the Board of Directors recessed on January 18, 1960, Temple, Bishop and Woodall took possession of the corporate records and assets of Georgia Casualty, and took active control of the management of the corporation and acted as officers. Temple claimed to act as Chairman of the Board, with Bishop as President of the plaintiff, and Eva Woodall as Secretary. These individuals were recognized as executive officers of the corporation by the other officers and employees of the company, and on various occasions certified themselves, under the seal of the corporation, to hold these respective offices.

Plaintiff contends that its Board of Directors and officers, as constituted previous to the meeting of January 18, 1960, tendered their resignations, but neither the official minutes of said meeting nor any of the records of the plaintiff corporation reflect any evidence that any resignation was made. Section 24, Article IV, of plaintiff's bylaws prohibits the transaction of any business by the Board of Directors unless by an action of a majority vote of a quorum present at the meeting, said quorum consisting of a majority of the full membership of the Board of Directors.

None of the newly elected members of the Board of Directors of the plaintiff, other than Temple, Bishop and Woodall, and none of the other directors of the corporation were present at the recessed meeting in the hotel.

During the afternoon of January 18, 1960, after the purported meeting above described, Messrs. Dominey, Sr., and Dilbeck caused to be transferred from themselves and their associates and to be issued in the name of Thrift Corporation of America 204,823 shares of the common stock of Georgia Casualty, evidenced by Stock Certificate No. 5964. This stock certificate was delivered to Temple, Bishop and Miss Woodall. At the same time, Temple, Bishop and Woodall delivered to Dominey and Dilbeck, in exchange therefor, checks of Thrift Corporation of America, payable to the owners in the aggregate amount of $532,-539.80, and exhibited to Dominey and Dilbeck another check of Thrift Corporation of America in the amount of $950,000.00, payable to Georgia Casualty, and advised Dominey and Dilbeck that this check would be immediately deposited to the account of Georgia Casualty in payment for the treasury stock of the company to be purchased by Thrift Corporation of America under the terms of the purchase contract. All of these checks of Thrift Corporation were drawn upon an account in the First National Bank of Atlanta, in which there were no funds except funds transferred from the account of Georgia Casualty in the manner hereinafter stated. None of the checks were certified, nor were they cashier's checks on any banking institution. These checks delivered to Dominey and Dilbeck in the aggregate amount of $532,539.80 were subsequently paid with funds withdrawn from the account of Georgia Casualty and deposited in the account of Thrift Corporation of America.

On the morning of January 18, 1960, prior to the meetings, Temple, Bishop and Woodall came to the offices of Georgia Casualty and Surety Company before the meeting of the Directors was held and were informed that a meeting of the Board would convene at 11:00 A. M. Temple expressed concern and stated that it would not be possible for his new directors to be present, since he had advised them that the meeting would be in the afternoon at 2:00 o'clock. Thereafter, on this same morning, January 18, 1960, before the Directors' meeting was held, Mr. Dilbeck took Bishop and Miss Woodall to the offices of the First National Bank of Atlanta and introduced them to Mr. Frank Davis, Vice-President of said bank who handled the account of the company. Dilbeck accompanied Bishop and Woodall to the bank, introduced them to Vice-President Davis as the new owners of the plaintiff, and took his leave, stating that he no longer had any interest in the business of the plaintiff. Bishop and Woodall submitted to Vice-President Davis purported resolutions and signature cards bearing an impression purported to be that of the plaintiff's corporate seal, which papers assumed to evidence the right of Temple, Bishop and Woodall to act on behalf of the plaintiff as its duly elected officers. A separate resolution was presented under the name and circumstances purporting to authorize Temple, Bishop and Woodall, acting for the corporation, to borrow the sum of $300,000.00 for which loan application was made, the loan being granted during the middle of that day. After Mr. Dilbeck left the bank, Vice-President Davis telephoned D. D. Dominey, Sr., and secured a confirmation of the Dilbeck representation while Bishop and Woodall were still in the bank and before the bank had accepted the purported resolutions and purported signature cards. The corporate resolution and signature card which were presented to Vice-President Davis, with respect to Georgia Casualty and Surety Company, were certified by Eva Woodall, Secretary, under the seal of the corporation, and purported to show that Messrs. Temple and Bishop and Miss Woodall were officers of Georgia Casualty Company, and as such, were authorized along with other officers named to withdraw funds on deposit in the account of Georgia

Casualty with the First National Bank. The signature card, in addition to the signatures of Temple, Bishop and Woodall, carried also signature of H. Y. Hutcheson, Jr., Assistant Treasurer, who was already authorized to sign for the company. At the same time, Mr. Bishop also presented to Vice-President Davis a letter on the stationery of Georgia Casualty and Surety Company, dated January 18, 1960, signed by Roy E. Bishop, as President of the plaintiff company, in which the writer advised Mr. Davis that a proposed merger of plaintiff with Eagle Fire Insurance Company would take place on February 1, 1960. Bishop advised Vice-President Davis that the insurance authorities desired that the plaintiff company have a larger cash balance on hand than it now had in order for them to effect the merger, and requested a loan from the First National Bank of Atlanta in the amount of $300,-000.00 to Georgia Casualty, said loan to be secured by a list of bonds. This list of bonds was submitted to Mr. Davis and sent by him to the Investment Department of the bank to be valued for collateral purposes; and the loan was subsequently approved. In support of his authority to make the loan, Bishop submitted to Vice-President Davis a purported certified copy of a corporate resolution.

On this same day, January 18, 1960, a new corporate resolution and signature card with reference to access to the safety deposit box of plaintiff were presented to the Citizens & Southern National Bank. This resolution was certified by Eva Woodall as Secretary of Georgia Casualty over the seal of the corporation.

At 12:00 Noon, on the same day, Eva Woodall opened the safety deposit box of Georgia Casualty at the Citizens & Southern National Bank and withdrew the securities set out in the list submitted to Vice-President Davis, and pledged the same to the First National Bank as security for a note of plaintiff in the amount of $300,000.00, executed by Roy E. Bishop as President and Eva Woodall as Secretary. The net proceeds of this loan, in the amount of $297,250.00, were deposited to the account of Georgia Casualty.

On the afternoon of January 18, 1960, an account under the name of Thrift Corporation of America was opened in the First National Bank of Atlanta. A corporate resolution and signature card, with Messrs. Temple and Bishop and Miss Woodall shown as officers authorized to withdraw funds, were presented. The Thrift Corporation of America was represented to be a corporation of the State of Delaware, but no such corporation ever existed under the laws of the State of Delaware. The account of Thrift Corporation of America was opened with deposit therein of two checks drawn on the account of Georgia Casualty in the First National Bank—one in the amount of $300,000.00 and one in the amount of $400,000.00. No funds were ever deposited in the account of Thrift Corporation of America except those transferred from the account of Georgia Casualty in the manner set out. On the same day this account was opened, Temple, Bishop and Woodall caused Thrift Corporation of America to draw two checks payable to the First National Bank of Atlanta in the amounts of $23,745.24 and $100,000.00. With these checks, these individuals purchased from the First National Bank drafts drawn on Chicago funds of the First National Bank payable to various individuals and institutions. On January 18, 1960, Temple and Bishop, as purported officers of Georgia Casualty, also executed and issued a check of Georgia Casualty in the amount of $50,000.00 to the First National Bank. Temple and Bishop purchased, with this check, a draft of equal amount from the First National Bank, payable to the National State Bank of Newark, New Jersey, and the said Temple and Bishop forwarded said funds to be held in escrow in the National State Bank of Newark, New Jersey, as provided under the terms of a certain agreement executed by Bishop, as President of Georgia Casualty, with one Max Rosenman. Both this agreement and a copy of the

$50,000.00 check were identified in evidence.

Attached to the contract between Rosenman and Georgia Casualty is a purported authority for Bishop to act as President under a resolution adopted at a meeting of the Board of Directors held on January 18, 1960. This resolution is certified by Eva Woodall as Secretary of the corporation.

On January 18, 1960, Bishop and Miss Woodall delivered to the First National Bank for redemption United States Government "G" Bonds in the face amount of $50,000.00. Subsequently, Temple and Miss Woodall, as Chairman and Secretary respectively of Georgia Casualty, directed that the proceeds be applied against the $300,000.00 loan made by the First National Bank.

Later, on January 25, 1960, Paul Temple and Eva Woodall submitted to the First National Bank a purported corporate resolution authorizing sale of corporate stocks, requesting the First National Bank to guarantee their signatures on endorsements for transfer of the stock certificates. Executed stock powers were submitted for guarantee. The bank, after procrastination, refused to guarantee the signatures of Mr. Temple and Miss Woodall as officers of Georgia Casualty.

On January 20, 1960, Vice-President Davis advised Mr. Dilbeck that the account of Georgia Casualty in the First National Bank had been drawn down to approximately $11,000.00, and Mr. Dilbeck, in turn, informed Mr. Dominey. Investigations were promptly begun which ultimately developed the fact that Messrs. Dilbeck and Dominey and associates had been paid for the stock purchased by Thrift Corporation, as above set forth, with funds transferred from Georgia Casualty in the manner described above.

Messrs. Dilbeck and Dominey thereupon promptly informed the Insurance Department of the State of Georgia as to what had transpired. Messrs. Dilbeck and Dominey and their associates repaid to plaintiff the sum of $529,536.80, which had been withdrawn from the account of Georgia Casualty and paid to them for their stock by Thrift Corporation.

On January 29, 1960, the safety deposit box of Georgia Casualty in the Citizens & Southern National Bank was opened under Court Order and a list of the contents is set out in one of plaintiff's exhibits. The safety deposit box also included six debentures of Thrift Corporation of America in the amount of $50,000.00 each. These debentures list the Thrift Corporation of America as a Delaware corporation, but no such corporation ever existed under the laws of the State of Delaware. Upon discovery of the transactions described above, the Seaboard Surety Company was notified by telephone by counsel for Georgia Casualty, and on January 28, 1960, was given written notice of the situation by registered letter.

Upon discovery of the facts above set forth, plaintiff proceeded immediately to employ counsel and file suit against Messrs. Temple and Bishop and Miss Woodall in the Superior Court of Cook County, Illinois, and against Rosenman and the National State Bank of Newark, New Jersey, in the Superior Court of New Jersey, Chancery Division in Essex County, New Jersey, to impound and recover the funds unlawfully deposited in said bank pursuant to the Rosenman contract as described above.

On March 24, 1960, counsel for plaintiff advised the Seaboard Surety by letter, and the defendant, Seaboard Surety, stipulated by letter, that no reasonable settlement which might be made by Georgia Casualty toward reducing the loss sustained would prejudice any claim Georgia Casualty might have under the bond issued by Seaboard Surety.

Thereafter, on May 13, 1960, plaintiff forwarded the proof of claim to the defendant. On August 26, 1960, defendant subsequently declined said claim.

Temple, Bishop and Woodall, purportedly acting as officers of plaintiff, incurred expenses for printing in the amount of $227.51 and travel in the

amount of $1,532.66, and used the funds of Georgia Casualty to pay therefor.

The action instituted by plaintiff in Cook County, Illinois, against Temple, Bishop and Woodall was settled for a net recovery of $646,928.13. The action in Newark, New Jersey, resulted in a net recovery for the plaintiff of $44,377.50. Plaintiff claims a net loss as a result of the transactions above described in the amount of $63,204.54.

It was agreed that certain third-party actions which have been instituted would be stayed until after this original action had been determined.

## DISCUSSION

Liability is asserted by the plaintiff against the defendant upon three different provisions of the Insuring Agreement. This Court shall discuss them in order.

Liability under Insuring Agreement No. 1 is predicated upon the contention that the three individuals, Temple, Bishop and Woodall, were officers of the plaintiff corporation, and that certain fraudulent and dishonest acts of these individuals, as described in the Statement of Facts set out above, were within the coverage of this Insuring Agreement. This Insuring Agreement No. 1 protects the insured against fraudulent, dishonest, or criminal acts of any employee while in the service of the insured. "Employee" therein defined includes "officers, clerks, and other persons in the insured's direct employ", but does not include "brokers * * * or other agents or representatives, or any person not in the direct employ of the insured". It is contended that Temple, Bishop and Woodall were officers of the corporation, so their dishonest acts would fall within this coverage.

In order to reach this point, plaintiff takes two positions. First, plaintiff contends that Temple, Bishop and Woodall were elected Directors, and that a director is an officer of the corporation. Second, plaintiff insists that Temple and associates were elected Directors and then, although they had no authority whatso-ever to do so, that they elected themselves as officers and acted as officers, thus becoming *de facto* officers being, as plaintiff contends, covered as employees under the policy.

To be able to recover under this agreement, Temple, Bishop and Woodall have to be either officers or employees, and plaintiff's own evidence eliminates any possibility that Temple, Bishop and Woodall were in any respect in the "employ" of plaintiff.

Temple, Bishop and Woodall were not only not officers in the sense of being "employees"; they were not officers of the plaintiff corporation in any sense. It is true that they assumed the offices and usurped the power of those officials for those offices which they held themselves out to represent; but this does not make them officers or employees within the meaning of the policy involved.

This Court feels that the language in the Insuring Agreement is clear, that whether one be an officer, clerk, or other person representing the insured, he must be in the "direct" employ of the insured. Certainly, interlopers are not covered by this Insuring Agreement. These interlopers were never elected officers by the Board of Directors at a legally constituted Board of Directors' meeting of Georgia Casualty and Surety Company.

If plaintiff's contention can prevail, it must rest on the basis that a director of the corporation is an officer, and that as such officer, he is an employee of the corporation.

Though a director may, in a sense, be considered a corporate officer, he exercises his office only through the collective action of the Board of which he is a member. A director has no individual power of action as does an officer who is usually elected or appointed to perform specific duties as agent of the corporation by the Board of Directors.

A director, as such alone, is not considered an "employee". 13 Am.Jur. 853, Sec. 865. See Vardeman v. Penn Mutual Life Ins. Co., 125 Ga. 117, on

page 119, 54 S.E. 66, on page 67, where the Court said:

"One distinction between officers and agents of a corporation lies in the manner of their creation. An office is created by the charter of the corporation, and the officer is elected by the directors or the stockholders. An agency is usually created by the officers, or one or more of them, and the agent is appointed by the same authority. It is clear that the two terms officers and agents are by no means interchangeable."

See also 13 Am.Jur. 854, Sec. 866. The director does not have "authority to act for the corporation unless vested with such authority by the Board". In the case of Farrar v. Pesterfield, 216 Ga. 311, 116 S.E.2d 229 (decided Sept. 21, 1960), the Supreme Court of Georgia held:

"A director may by express agreement or by usage become the agent of the company, and his acts may become binding on it. But the mere fact that he is a director gives him no right to bind the company by his acts or sayings. Directors act as a body, not by the statements of an individual director, unless he has received authority to speak for the company. Garmany v. Lawton, 124 Ga. 876, 53 S.E. 669."

The distinction is not only established by these cases; it is to be found in the bylaws of this corporation where the distinction is clearly made by the provision that the selection, duties and compensation of "officers, agents, and employees" be exclusively within the province of the Board of Directors. See Bylaws, Article IV, Secs. 25 and 26; Article V, Sec. 31, et seq.

■ The rights of third parties are not involved in this case. Therefore, plaintiff cannot contend successfully that Temple, Bishop and Woodall were *de facto* officers. Smith v. Meador, 74 Ga. 416; Hall v. Carey, 5 Ga. 239; 18 Am. Jur. 862, Secs. 876, 877.

The only question, therefore, is whether these interlopers, Temple, Bishop and Woodall, were duly and legally elected directors, officers and agents of the plaintiff corporation. The question in no way involves a determination of the scope of the authority, nor ultra vires acts, nor the extent of their authority, but merely and simply the origin and validity of their authority and office.

It was held in Hornaday v. Goodman, 167 Ga. 555, at page 572, 146 S.E. 173, at page 181:

"A by-law is a permanent rule of action for the government of members of a corporation in the conduct of the corporate affairs. It may be said to be a legislative act of the corporation."

Also, as was held in Gwin v. Thunderbird Motor Hotels, Inc., 216 Ga. 652, at page 658, 119 S.E.2d 14, at page 18:

"The bylaws of a corporation are binding on the parties who enact them as contracts."

The facts are plain that Temple and associates were purely intruders who acted with fraudulent purposes. There was no contract of employment existing nor even in contemplation. There was no valid act within the scope of the laws of Georgia or the bylaws of the plaintiff corporation which changed the existing Board or the number of its officers. There was no valid act of the Board which gave Temple, Bishop and/or Woodall any authority to act in behalf of the corporation.

Insuring Agreement No. 1 under the policy contemplates losses sustained by the fraudulent conduct of those in the "direct employ of the corporation".

The relation between plaintiff and Temple and associates was not that of an employer and employee in any sense of those words, nor was any semblance of authority given to them to act in any representative capacity for the plaintiff.

There is nothing in the evidence which defendant can discover to indicate that Temple and associates ever undertook the normal operation of the plaintiff's

business. All Temple and his associates did was to carry out their pre-conceived scheme of fraud.

Plaintiff relies upon the Georgia cases of Hinton v. Lindsay, 20 Ga. 746, and Tarpley v. Carr, 204 Ga. 721, 51 S.E.2d 638, contending that Temple and associates were *de facto* officers. In both of these cases, the Supreme Court of Georgia held that the *de facto* status is the result of a claimed office under color of election or appointment. *De facto* status, under these decisions, does not extend to usurpers.

The Hinton case, supra, makes it clear that the *de facto* doctrine is a matter of public convenience and policy for the protection of those who have relied upon and acted upon the acts of an illegally appointed or elected officer without a knowledge or opportunity of knowledge of such illegality.

The Tarpley case, supra, concerned a city charter which was declared unconstitutional, and the question was to the effect of the actions of the mayor and councilmen elected under their unconstitutional charter. The Court held that these persons were, as to the public, *de facto* officers, saying at page 728, at page 643 of 51 S.E.2d:

> "The official acts of such persons are recognized as valid on the grounds of public policy, and for the protection of those having official business to transact."

■ Under this Insuring Agreement No. 1, it is clear that the only possible *de facto* status which Temple and associates achieved might have been that of *de facto* directors; this position gave them no authority to act individually, but only to act as members of the whole Board in regular meetings. As far as the plaintiff corporation was concerned, even if Temple and associates did elect themselves as officers of the corporation, this election was not under the slightest color of right and was not recognized by the stockholders as such; instead, the stockholders recognized that Temple and associates were merely usurpers. Neither does the *de facto* status extend to this corporation, but the *de facto* principle of law is for the protection of innocent third parties.

Liability as asserted by the plaintiff under the terms of Insuring Agreement No. 2 is predicated upon the contention that the fraudulent and dishonest misappropriations effected by Temple, et al., constituted "wrongful abstractions" within the coverage of this Insuring Agreement.

Under Insuring Agreement No. 2, the defendant surety company contracted to insure the plaintiff corporation against "loss * * * through * * * wrongful abstraction", and if the misappropriations perpetrated by Temple, et al., constituted wrongful abstractions within the contemplation of that term, as used in this Insuring Agreement, then the defendant surety company was clearly liable to the plaintiff corporation for the loss incurred without regard to whether Temple, Bishop and Woodall were, or were not, officers of the corporation within the contemplation of Insuring Agreement No. 1.

The meaning of the term "wrongful abstraction", as used in various fidelity bonds, has been the subject of much litigation. Black's Law Dictionary, Fourth Edition, defines "abstraction" as follows:

> *Abstraction.* Taking from with intent to injure or defraud, "wrongful abstraction" is "unauthorized and illegal taking or withdrawing of funds, etc., and appropriation thereof to taker's benefit." Pacific Coast Adjustment Bureau v. Indemnity Ins. Co. of North America, 115 Cal. App. 583, 2 P.2d 218, 219.
>
> For benefit of taker or of another with his consent. Austin v. Nieman, Tex.Civ.App., 3 S.W.2d 128, 129. Offense for bank officer, popular sense of word. Commonwealth v. Dauphinee, 121 Pa.Super. 565, 183 A. 807, 813. Under the National Bank Act, not necessarily the same as embezzlement, larceny, or misapplication of funds. Ferguson v. State, 80 Tex.

Cr.R. 383, 189 S.W. 271, 273. State v. Hudson, 93 W.Va. 435, 117 S.E. 122, 126.

Attorneys for the defendant contend that the money in Georgia Casualty & Surety's account in the First National Bank of Atlanta was the property of said bank, and that Georgia Casualty and Surety Company was only a creditor of the bank to the extent of the deposit. It is contended that the deposit account of Georgia Casualty and Surety Company in the First National Bank was not the physical property of money or securities as covered by Insuring Agreement No. 2; that the bank account is merely a credit on which the depositor may draw in accordance with the terms of the deposit contract; and that the depositor, such as Georgia Casualty, has no ownership in the funds represented by this credit. It is contended that, regardless of the means by which the wrongful withdrawal of the deposit was made, if the withdrawal constituted a "wrongful abstraction", it was a "wrongful abstraction" of money belonging to the First National Bank and not the money of the Georgia Casualty and Surety Company. It is true that under the Georgia law, Twiggs County Bank v. McCallum, 39 Ga.App. 306, 307, 147 S.E. 129, 130; Federal Deposit Insurance Corp. v. Thompson, 54 Ga.App. 611(2), 188 S.E. 737:

"One who has money in a bank on general deposit is a creditor of the bank."

However, an examination of the broad terms of Insuring Agreement No. 2 and a review of the limited cases upon this question indicate that the contractual relationship of the policy set out in the policy involved indicate that the coverage contemplated in Insuring Agreement No. 2 covers "wrongful abstractions" perpetrated by Temple and associates against the insured, Georgia Casualty and Surety Company.

In National Surety Company v. First State Bank, Tex.Civ.App., 244 S.W. 217, the surety company had given a fidelity bond to indemnify the bank against "such pecuniary loss as it might sustain of money or other valuable securities embezzled, wrongfully abstracted, or willfully misapplied" by its cashier. At page 221 of its opinion, the Court of Appeals held:

"Indeed, as concerns the cashier, we are unable to hold that there was not also a wrongful abstraction of the bank's money when he, in the circumstances above detailed by himself, signed the drafts and made the remittances to other banks to cover checks issued by Huffington in pursuance of his known practice of filching from his own bank; *this was an actual taking of funds out of the bank, as much so as if he had personally removed and delivered them,* and the fact that it was done for another's financial benefit rather than his own would not make it any the less a wrongful abstraction on his part." (Underscoring supplied).

In Chapman v. Nieman, Tex.Civ.App., 276 S.W. 302, the surety gave a fidelity bond to indemnify a bank against such pecuniary loss as it might sustain of money or other valuable securities "embezzled, wrongfully abstracted, or wilfully misapplied by Nieman". There was no evidence that Nieman personally ever appropriated any of the bank funds or securities, but the theory of the suit was that he had aided and abetted a cashier in so doing. The trial court directed a verdict in favor of Nieman and his surety, but this decision was reversed by the Court of Civil Appeals which said:

"Appellants do not claim that the acts of Nieman shown by the evidence in this case constituted embezzlement. *Wrongful abstraction, as used in said bond, means an unauthorized and illegal taking or withdrawing of funds or securities from the possession and control of the bank and the appropriation of such funds or securities to the benefit of the taker, or to the benefit of another with his knowledge and consent.*" (Underscoring supplied).

The same definition of "wrongful abstraction" stated above is quoted with approval in a California case, Pacific Coast Adjustment Bureau v. Indemnity Insurance Co., 115 Cal.App. 583, 2 P.2d 218, 219. Another case in point from Pennsylvania is American Surety Company of New York v. Meadville Lodge No. 219, 114 Pa. Super. 451, 174 A. 591. In this case, Treasurer Weber, of a lodge to whom the defendant surety had given bond agreeing to indemnify it against any loss of its funds or property "by reason of any act or acts of fraud or dishonesty, including forgery, theft, embezzlement, or wrongful abstraction", on the part of its secretary or treasurer, took funds from the lodge and misappropriated them to the use of a cemetery association of which he was secretary. Holding that his action constituted a "wrongful abstraction" within the meaning of the surety bond, the Court said:

"We agree with appellant that the acts of Weber in placing the funds of the lodge in the account of the cemetery association constituted, under the admitted circumstances, a 'wrongful abstraction' within the meaning of the bond. It is clear, despite the averments of the affidavit of defense, that this action was not the result of error or mistake. It is not questioned that the securities of the lodge were converted and their proceeds purposely and deliberately transferred in order that certain debts of the cemetery association might be paid. This obviously constituted a wrongful abstraction if the term is to receive a common-sense construction. It may be true that Weber intended to have the money paid back to its rightful owner. It was not essential that the evidence, in this case, should show beyond a reasonable doubt that his motive was technically criminal; the language of the bond did not require such proof in order to establish the liability of the surety. The fact remains that the money was taken from its owner and put in the custody and control of another and used for the latter's benefit. It is just such loss of control and dishonesty that such bonds are intended to insure against. Had the funds of the cemetery association been dissipated before recovery was had, undoubtedly the lodge would have been the first to claim that there had been a wrongful abstraction. The language of the bond is not ambiguous. Manifestly, it was an 'abstraction' to take the funds in question out of the lodge's account; it was clearly 'wrongful' to devote them to the use, and to the sole benefit, of a third party."

From these cases, it is apparent that the term "wrongful abstraction", as used in the policy sued upon, has a well-defined legal meaning. It refers to an unauthorized and illegal taking or withdrawal of funds or securities, which are actually within any premises of the insured or are within the premises of any banking institution, from the possession and control of the insured, and the appropriation of such funds or securities to the benefit of the taker, or to the benefit of another with his knowledge and consent.

The funds in the First National Bank of Atlanta and the securities in the safety deposit box of the Citizens & Southern National Bank of Atlanta, which were misappropriated by Temple and associates in this case, were actually within the premises of the plaintiff or within the premises of a banking institution which was holding them for the benefit of the plaintiff; and, from the Statement of Facts set out above, it is obvious that the acts of Temple, Bishop and Woodall in misappropriating these funds clearly constituted "wrongful abstraction" within the purview of this term as used in the Insuring Agreement No. 2 in the policy sued upon. Recovery may, therefore, be had under this clause of the policy without regard to the status of the wrongdoers, Temple, Bishop and Woodall, as officers of the plaintiff corporation.

Under Insuring Agreement No. 4, the defendant surety company contracted to insure the plaintiff corporation against "loss through forgery", and plaintiff contends that the various notes, collateral assignments, and checks issued by Temple, Bishop and Woodall, as purported officers of the plaintiff corporation were made falsely and without authority, and that the certified copies of corporate resolutions referred to in the Statement of Facts were made falsely and that said documents constituted forgeries within the meaning of that term as used in the comprehensive blanket policy issued by the defendant surety company.

■ All of the written instruments used by Temple and associates were drawn in the name of Georgia Casualty and Surety Company under the genuine signatures of Temple and associates. Not one of the instruments in question purports to bear the signature of any person than that of the person or persons actually signing or making the writing. The phrase "loss through forgery", as used in this Insuring Agreement, can refer only to the crime of forgery. This is especially clear in the light of the Insuring Agreement No. 1 in its broad coverage of loss through any "fraudulent, dishonest, or criminal act" of any employee or officer of the insured.

The late Judge Richard Russell, Sr., wrote a learned and exhaustive dissertation on the subject of forgery, which is to be found in the leading case of Barron v. State, 12 Ga.App. 342, 77 S.E. 214. At page 346, at page 216 of 77 S.E. of the opinion, Judge Russell made it clear that the common law and Georgia Code definitions of forgery are essentially the same, stating:

"'* * * Forgery, as common law, is the false making or material altering, with intent to defraud, of any writing which, if genuine, might be of legal efficacy or the foundation of a legal liability.' 2 Bishop's Crim.Law, (8th Ed.) § 523."

Judge Russell, in the Barron opinion, cites the case of State v. Willson, 28 Minn. 52, 9 N.W. 28, where the accused executed a false paper as agent for a named principal, and conviction for forgery was reversed, the Court quoting with approval:

"'Where one executes an instrument purporting, on its face, to be executed by him as the agent of a principal therein named, when, in fact, he has no authority from such principal to execute the same, he is not guilty of forgery. The instrument is not a false or fraudulent deed, within the meaning of the statute. *This is not false making of the instrument, but merely the false assumption of authority.'*"

Also, in the case of Samples v. Milton County Bank, 34 Ga.App. 248, 129 S.E. 170, plaintiff, a depositor, sought to recover amounts charged to her account for checks cashed by her husband, signed "Mrs. N. B. Samples, by N. B. Samples". The bank cashed the checks knowing that the signature was not the genuine signature of plaintiff, and the latter denied that her husband had authority to sign her name. The bank invoked the 60-day notice provision under the Banking Act with relation to "forged checks". The lower court charged, after defining a "forged check", that the 60-day provision would bar recovery if these were found to be forged checks. Verdict was returned for defendant, and plaintiff appealed on the ground that these were not "forged checks" and the 60-day provision did not apply. The Court sustained plaintiff's appeal and said on page 250, on page 171 of 129 S.E.:

"* * * a 'forged' check, as this term is used in the act, will be construed as referring to a check which is the result of an act of forgery, as defined in the criminal statutes. Johnson v. Bradstreet Co., 87 Ga. 79, 82, 13 S.E. 250; * * *. 'To constitute forgery, the writing must purport to be the writing of another than the person making it. * * * Where one executes an instrument purporting on its face to be executed by him as the agent of the principal, he is not guilty of forgery, although

he has in fact no authority from such principal to execute the same. This is not the false making of the instrument, but merely a false and fraudulent assumption of authority. *The essence of forgery is the making of a false writing, with the intent that it shall be received as the act of another than the party signing it; and where it appears that it could not have been intended that the false writing should be received as other than what it purports to be, the maker may be guilty of cheating and swindling, but cannot be guilty of forgery.'* Barron v. State, 12 Ga. App. 342(7), 77 S.E. 214."

Since the instruments executed by Temple and associates were not presented with the intent that they be received as the acts (signatures) of any person than the person signing, they were not forgeries, and the defendant could not be held liable under Insuring Agreement No. 4.

In addition to the losses which plaintiff asserts under Insuring Agreements above considered, plaintiff contends that it is entitled to recover, in addition to the face amount of said policy plus legal interest thereon, 25 percent as damages, plus reasonable attorneys' fees for the prosecution of this action as authorized and provided in Section 56–706 of the Code of Georgia.[1]

In Georgia, the refusal of an insurance company "in bad faith" to pay means, in Georgia, a frivolous and unfounded denial of liability. If there is any reasonable ground for contesting the claim, there is no bad faith. Pearl Assurance Co. v. Nichols, 73 Ga.App. 452, 455, 37 S.E.2d 227.

Whether there was any reasonable grounds for contesting the claim is a matter which depends upon the circumstances existing when liability is declined or not admitted, not by the event of the ultimate determination. Hanover Fire Insurance Co. of New York v. Argo, 5 Cir., 251 F.2d 80, 83.

None of the appellate cases of the State of Georgia cited by counsel for the parties deals with anything like the facts upon which the plaintiff relies. It appears to this Court that the issues in this case are novel. Some of the questions involved in this case are for the first time adjudicated in this state. From the complicated state of facts considered by the Court in this case, it cannot be said that such questions are easy of solution. Under these circumstances, this Court cannot say that a resort to the courts by the defendant to have these questions determined was unreasonable. Certainly, the defendant should not be charged with penalties and attorneys' fees under the state of facts in this action. See Massachusetts Ben. Life Association v. Robinson, 104 Ga. 256, 291, 30 S.E. 918, 42 L. R.A. 261.

As a question of fact or of law, the plaintiff should not recover penalties and attorneys' fees as provided in Section 56–706 of the Georgia Code Annotated.

---

1. "The several insurance companies of this State and foreign insurance companies doing business in this State in all cases when a loss shall occur and they shall refuse to pay the same within 60 days after demand shall have been made by the holder of the policy on which said loss occurred, shall be liable to pay the holder of said policy, in addition to said loss, not more than 25 per cent. on the liability of said company for said loss; also, all reasonable attorney's fees for the prosecution of the case against said company: Provided, it shall be made to appear to the jury trying the case that the refusal of the company to pay the said loss was in bad faith." Georgia Code Annotated 56–706 (1933).

(This section has been changed to Code Section 56–1206 of the new Insurance Code of Georgia under the Georgia Acts of 1960).